IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT


**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**


| | |
|---|---|
| DAVID BRUNO AND ANGELA BRUNO, HUSBAND AND WIFE AND ANTHONY GOTTI BRUNO AND MCKAYLA MARIE BLAKE, BY THEIR PARENTS AND LEGAL GUARDIANS, DAVID BRUNO AND ANGELA BRUNO, | : No. 25 WAP 2013<br>:<br>: Appeal from the Order of the Superior<br>: Court entered July 10, 2012 at No. 1154<br>: WDA 2011, affirming in part and vacating<br>: in part the Order of the Court of Common<br>: Pleas of McKean County, entered June |
| Appellants | : 27, 2011 at No. 1369 C.D. 2009, and<br>: remanding.<br>: |
| v. | : ARGUED:  April 8, 2014<br>:<br>:<br>: |
| ERIE INSURANCE COMPANY, RUDICK FORENSIC ENGINEERING, INC., THERESA PITCHER AND MARC PITCHER, | :<br>:<br>:<br>:<br>: |
| Appellees | : |


## OPINION


**MADAME JUSTICE TODD**                    **DECIDED:  DECEMBER 15, 2014**

In this interlocutory appeal, we consider two questions:  (1) whether a negligence claim brought against an insurer by its insureds — for alleged statements made by the insurer's adjuster, and an engineer the insurer had retained, that mold which the insureds discovered while performing home renovations was harmless and that they should continue their renovations — was barred by the "gist of the action" doctrine on the grounds that the true gist or gravamen of the action was an alleged breach of the insurance contract, their homeowners' policy; and (2) whether the provisions of

Pa.R.C.P. 1042.1 and 1042.3 required the insureds to obtain a certificate of merit in order for them to proceed with their negligence suit against the professional engineer employed by the insurer to evaluate the mold. After careful review, we hold that the insureds' negligence claim was not barred by the gist of the action doctrine, as the claim was based on an alleged breach of a social duty imposed by the law of torts, and not a breach of a duty created by the underlying contract of insurance. We additionally conclude that the insureds were not required to obtain a certificate of merit in order to proceed with their negligence suit against the professional engineer, since they were not patients or clients of the engineering company which employed him. Consequently, we reverse the order of the Superior Court and remand for further proceedings.

### I. Factual and Procedural Background[1]

In September 2007, Appellants David and Angela Bruno ("Brunos"), purchased a home in Bradford, McKean County from Appellees Theresa and Marc Pitcher, and obtained a policy of homeowner's insurance for it issued by Appellee, Erie Insurance Company ("Erie"). The policy covered both themselves and their two minor children — Appellants Anthony Gotti Bruno and McKayla Marie Blake — and it also included a separate endorsement or rider covering physical loss to the property caused by "fungi," which the endorsement defined, *inter alia*, as "any type or form of . . . molds." See "Limited Fungi, Wet or Dry Rot or Bacteria Coverage Endorsement" (Exhibit B to Complaint) at 1. This rider obligated Erie to pay the Brunos up to $5,000 for "[d]irect physical loss" to the property caused by mold, or any "[n]ecessary increase in costs"

---

[1] This background is derived from the complaint filed in the trial court which commenced the instant litigation. Inasmuch as this case comes to our Court as an appeal from the trial court's grant of a demurrer to that complaint, our standard of review requires us to accept as true all well-pleaded facts contained therein. Bilt-Rite Contractors v. Architectural Studios, 866 A.2d 270, 272 (Pa. 2005).

they incurred to maintain their "normal standard of living" should their residence be rendered uninhabitable as the result of mold. Id. The rider also required Erie to pay the cost of testing the air and any part of the covered property in order "to confirm the absence, presence or level of" mold "to the extent there is a reason to believe" mold was present, and, if mold was present, it obligated Erie to pay for the cost of its removal, including the cost of tearing out any part of the property needed to gain access to the mold. Id.

On October 5, 2007, after the Brunos moved into their home, David Bruno, with the assistance of a contractor he had hired, began the process of renovating the basement, during which they removed a portion of the wood paneling which was completely covering the block walls of the basement. Once the paneling was detached, Mr. Bruno discovered two areas of black mold growing on the block walls underneath, which were in proximity to leaking water pipes.

Mr. Bruno promptly informed Erie of this discovery and, also, that he wished to initiate a claim under his homeowners' policy. In response, on October 6, 2007, Erie sent an adjuster to his home to view the mold. The adjuster took no action at that time, but, instead, returned on October 8, 2007 with an engineer employed by Appellee, Rudick Forensic Engineering Company ("Rudick"), which had been retained by Erie to investigate the mold problem, determine its severity, and ascertain the extent to which remediation was required. After the adjuster and the engineer examined the mold growth, Mr. Bruno requested that the adjuster authorize payment of the policy limits — $5,000 — in order to have the mold tested. In response to Mr. Bruno's request, the adjuster and the engineer informed Mr. Bruno that "the mold was harmless and that they should continue tearing out the existing paneling [and] that health problems associated with mold were a media frenzy and overblown." Complaint, 8/30/10, at ¶ 19.

The adjuster refused payment on the basis that he lacked authorization to pay the claim, and he additionally asserted that no determination as to coverage had been made.

Based on the assurances of the adjuster and engineer that the mold was not a health hazard, the Brunos continued to live in the house, and Mr. Bruno continued with the renovations. As the month of October progressed, Mr. Bruno and his contractor attempted to eradicate the mold which they had previously discovered, and they also removed additional sheets of paneling. These actions revealed more leaking pipes and additional areas of mold growing on the walls beyond that which was initially discovered.

Mr. Bruno informed Erie of these further discoveries, and Erie dispatched the same engineer employed by Rudick who had visited the premises previously, and the engineer visually inspected the newly-discovered areas of mold, but he did nothing else. Even though the engineer performed tests of the mold, he did not disclose those results to the Brunos, nor did he or the adjuster apprise the Brunos of the true hazard to human health posed by the mold, or indicate that it should be removed or remediated.

Meanwhile, during October, each member of the Bruno family began to suffer respiratory ailments which worsened in the months thereafter. By January 2008, Angela Bruno's physical condition had deteriorated to the point that she developed severe coughing, difficulty breathing and clearing her throat, and intense headaches. At this point, the Brunos elected to have the mold tested, at their own expense, which revealed that the mold was toxic in nature and hazardous to human health.

After receiving the test results in January 2008, the Brunos demanded payment from Erie of the full $5,000 for the purpose of eradicating the mold, and they also made a claim under other provisions of their policy for repair of the water damage caused by

the leaking pipes. Erie informed them that the matter was still being investigated and a claim decision had not yet been made. Finally, in April 2008, Erie made a $5,000 payment under the mold endorsement of the homeowners' policy.

Angela Bruno was later diagnosed with cancer of the throat and esophagus, which her treating physicians attributed to her exposure to the toxic mold. Fearing for their safety, the Brunos subsequently vacated the house, which they were later forced to demolish, as the mold could not be eradicated.

On August 30, 2010, the Brunos filed a 12-count civil complaint against Erie, Rudick, and the Pitchers. Relevant to the specific question presented by the current appeal, in count 7 of this complaint, the Brunos asserted that Erie engaged in the following negligent acts and omissions which caused them damage and injury: "failure to recognize the nature and severity of the mold problem at the premises"; "misleading [the Brunos] concerning the nature of the mold problem in general and as it related to their health and home"; "minimizing the dangers and consequences of the mold infestation when it knew or should have known otherwise"; and the "creation or exacerbation of a dangerous condition." Complaint, 8/30/10, at ¶ 91.[2] [3] We will, hereinafter, refer to these allegations collectively as the Brunos' "negligence claim."

Additionally, in count 10 of their complaint, the Brunos raised a claim against Rudick for professional negligence, alleging, *inter alia*, that it was negligent for: delaying and then improperly conducting mold testing of the Bruno home; failing to properly read,

---

[2]  In count 7, the Brunos additionally pled 18 other purported negligent acts and omissions of Erie; however, inasmuch as our grant of allowance of appeal only encompasses the Brunos' negligence claim predicated on the conduct of Erie's adjuster and Rudick in advising the Brunos that the mold they discovered was harmless, and that they should proceed with the renovations, see infra at note 10, we need not address in the instant appeal whether these additional allegations of Erie's negligence are barred by the gist of the action doctrine.

[3]  The Brunos did not plead a breach of contract claim against Erie.

interpret, and analyze the test results; delaying the reporting of the test results to the Brunos; failing to recognize and report to the Brunos the danger to their health and to the premises created by the mold; and minimizing the dangers and consequences posed by the mold infestation, when it knew or should have known otherwise. Id. at ¶ 111.

Both Erie and Rudick filed preliminary objections in the nature of a demurrer. The basis of Erie's demurrer was that the Brunos' negligence claim against it was barred by the "gist of the action" doctrine which, as discussed more fully herein, provides that an alleged tort claim against a party to a contract, based on the party's actions undertaken in the course of carrying out a contractual agreement, is barred when the gist[4] or gravamen[5] of the cause of action stated in the complaint, although sounding in tort, is, in actuality, a claim against the party for breach of its contractual obligations. Rudick grounded its demurrer on the contention that the Brunos' claim for professional negligence should be stricken due to their failure to file a certificate of merit within 60 days of the filing of their complaint, as required by Pa.R.C.P. 1042.3(a).

The trial court sustained Erie's preliminary objections, noting that, under the Superior Court's formulation of the gist of the action doctrine, the critical distinction between a breach of contract action and a tort action is that "the former arises out of 'breaches of duties imposed by mutual consensus agreements between particular individuals,' while the latter arises out of 'breaches of duties imposed by law as a matter of social policy.'" Trial Court Opinion, 5/24/2011, at 2 (quoting Erie Ins. Exchange v. Abbott Furnace Co. 972 A.2d 1232, 1238-39 (Pa. Super. 2009)). The trial court

---

[4] The term gist has traditionally been understood to mean "[t]he ground or essence []of a legal action[]." Black's Law Dictionary 711 (8th ed. 2009).

[5] Gravamen is defined as "[t]he substantial point or essence of a claim, grievance or complaint." Id. at 721.

reasoned that "[b]ut for the insurance policy, Erie would owe [the Brunos] no obligation as defined by larger social policies embodied by tort laws," Trial Court Opinion at 2; thus, it dismissed the Brunos negligence claim against Erie.

The trial court also granted Rudick's preliminary objections, interpreting our Court's decision in Bilt-Rite, supra (permitting suit by bidder on public construction contract against engineer who prepared technical specifications of bid for the school district under theory that engineer negligently furnished information, upon which the bidder justifiably relied, to proceed under Section 552 of the Restatement (Second) of Torts, "Information Negligently Supplied for the Guidance of Others," despite lack of contractual privity between bidder and engineering firm), as establishing that privity of contract is not a prerequisite for maintaining a negligence action against an engineer who supplies information which he intends or knows will likely be used by others. Thus, the court reasoned that, because privity of contract was not required in order for the Brunos to proceed on their professional liability claim against Rudick, they were obligated to file a certificate of merit within 60 days of filing their complaint and, since they did not do so, the court struck this claim from their complaint.[6]

Upon application of the Brunos, the court amended its order pursuant to Pa.R.A.P. 341(c) to include an express determination that an immediate appeal would facilitate the resolution of the entire case. Pursuant to this order, the Brunos took a direct appeal to the Superior Court, which affirmed in part and reversed in part in an unpublished memorandum opinion authored by Judge Olson and joined by Judges

---

[6] The Brunos, while maintaining the position that they were not obligated to file a certificate of merit, in an apparent abundance of caution also sought an extension of time from the trial court to file the certificate. The court denied this motion, and the propriety of that denial is not before us in this appeal.

Bowes and Platt.[7]  Bruno v. Erie Ins., et.al., No. 1154 WDA 2011, unpublished memorandum (Pa. Super. filed 7/10/2012) (hereinafter "Bruno").  With respect to the question of whether the Brunos' negligence claim against Erie was properly dismissed under the gist of the action doctrine, the court, relying primarily on its published decisions in Erie Ins. Exch., supra, and Hart v. Arnold, 884 A.2d 316 (Pa. Super. 2005), focused on whether the duties alleged to have been breached arose from the obligations imposed on the parties by the terms of their contract, or whether they were duties created by the larger social policies as embodied in the law of torts.  The court found that "the gravamen of [the Brunos'] action against Erie Insurance sounds in contract — not in tort."  Bruno, at 15.  The court determined that the Brunos' relationship with Erie "arose out of — and is defined by — the Homeowner's Insurance Policy."  Id. at 16.  The court noted that, after the Brunos discovered the mold, they took action under the terms of this policy by initiating a claim for mold and water damage, after which Erie, in accordance with its obligations under the terms of its policy, sent its adjuster and the engineer from Rudick to investigate.  The court reasoned that if Erie improperly performed its investigation, then Erie breached its contractual duty to the Brunos under the policy.  Id.  Therefore, the court deemed the allegations against Erie made in the Brunos' negligence claim to involve breaches of Erie's contractual obligations and not breaches of a broader societal duty arising out of the social policies furthered by the law of torts.  Id.  Specifically, the court opined that "'the nature of [the Brunos'] action [against Erie Insurance] as a whole' is a contractual one and any duty

---

[7]  In its disposition, the Superior Court also reversed the trial court's ruling denying the Brunos leave to amend their complaint to plead a claim for punitive damages, and affirmed the decision of the trial court not to grant the Brunos an extension of time to file a certificate of merit.  These aspects of the Superior Court decision are not before us in the present appeal.

Erie Insurance owed to [the Brunos] was defined by the terms of the Homeowner's Insurance Policy." Bruno, at 18 (internal quotation and citation omitted).

The court additionally rejected the Brunos' argument that Erie's adjuster could be found negligent under Section 323 of the Restatement (Second) of Torts — "Negligent Performance of Undertaking to Render Services" — which permits the imposition of liability on an individual for any physical harm caused by the individual's negligent rendering of services to another, which the individual should recognize are "necessary for the protection of the other's person or things." Id. at 17. The court concluded that Section 323 was inapplicable to the instant matter because, in the court's view, the adjuster was performing services for Erie to determine if it was responsible for paying the claim under the policy, and, hence, he did not undertake to render any services *to the Brunos*.

As for the certificate of merit issue regarding the suit against Rudick, the court agreed with the trial court that the Brunos' assertion of professional negligence on the part of the engineering company required it to file a certificate of merit, since it interpreted the requirements articulated in Pa.R.C.P. 1042.3 as not limited to just those in privity of contract with the professional rendering the services, and so rejected the Brunos' argument that they did not need to file the certificate. The court, employing a policy-based analysis, determined that accepting the Brunos' contention would be "antithetical to the purpose behind the certificate of merit requirement" articulated by our Court, which was to "'devise an orderly procedure that would serve to identify and weed non-meritorious malpractice claims from the judicial system efficiently and promptly.'" Id. at 23-25 (quoting Womer v. Hilliker, 908 A.2d 269, 275-76 (Pa. 2006)). The court noted that our Court in Bilt-Rite, supra, recognized that engineers may be found professionally liable to third parties when it is foreseeable that the information the

engineers provide to a client will be used and relied on by the third party. Hence, the court considered it an absurd result to require that a party who is in direct contractual privity with the engineer provide a certificate of merit when bringing a claim predicated on the engineer's alleged provision of negligent advice, whereas a third party bringing a suit based on that very same advice would be relieved from filing such a certificate. The court found that these considerations, coupled with the plain language of Rule 1042.3, which applies to "any action based upon an allegation that a licensed professional deviated from an acceptable professional standard," mandated that third parties like the Brunos "must support their professional liability claims with a certificate of merit." Bruno, at 25 (quoting Pa.R.C.P. 1042.3).

We granted allowance of appeal to consider the following issues:

> 1. Does the "gist of the action" doctrine bar recovery on the Brunos' negligence claim against Erie Insurance Company ("Erie" or "Insurer") where their claim was not based on the underlying insurance contract or Erie's obligations thereunder, but instead upon independent, affirmative, and gratuitous acts and omissions of the Insurer and its expert agent/contractor when they summarily and without analysis or testing told Mr. Bruno that the mold infestation in the home was not dangerous and described the dangers of mold as a media exaggeration?

> 2. In promulgating Rule 1042.1 et. seq. of the Pennsylvania Rules of Civil Procedure, did this Honorable Court, by the plain language used, require that only patients or clients of a negligent professional be obligated to file a Certificate of Merit, and was it therefore error for the Courts below to dismiss the Brunos' professional negligence claim against Defendant, Rudick Forensic Engineering, Inc. ("Rudick" or "Contractor"), because they were neither patients nor clients of Rudick?

Bruno v. Erie Ins. Co., 74 A.3d 1027-28 (Pa. 2013) (order).

## II. Propriety of the grant of a demurrer under the gist of the action doctrine.

The question presented in a demurrer is whether, on the facts averred, "the law says with certainty that no recovery is possible." MacElree v. Philadelphia Newspapers, Inc., 674 A.2d 1050, 1054 (Pa. 1996). If doubt exists concerning whether the demurrer should be sustained, then "this doubt should be resolved in favor of overruling it." Bilt-Rite, 866 A.2d at 274. Our Court's standard of review of a lower court's decision granting a demurrer is *de novo.* Bayada Nurses, Inc. v. Com., Dep't of Labor and Indus., 8 A.3d 866, 871 n.4 (Pa. 2010).

## A. Arguments of the Parties

The Brunos begin their argument by addressing what they consider to be the present status of Pennsylvania law regarding the gist of the action doctrine. The Brunos note that federal district courts in Pennsylvania, the Third Circuit Court of Appeals, and the Superior Court all have claimed that our Court has, heretofore, not formally adopted the gist of the action doctrine, and that both the Third Circuit and the Superior Court have predicted we will.[8] The Brunos argue that, while our Court may not have formally adopted this doctrine, we have previously applied it, with opposing outcomes, in two venerable decisions discussed infra: Zell v. Arnold, 2 Pen. & W. 292, 1830 WL 3261 (Pa. 1830) (holding that the gist of a property owner's action against a millwright, whom he had contracted to build a clover mill and to level the adjacent streambed, was tortious since, although arising out of performance of the contract, was not for breach of the millwright's contractual duties, but rather for alleged negligence in performing the contracted tasks), and Horney v. Nixon, 61 A. 1088, 1089 (Pa. 1905) (holding that purported tort claim against theater by disappointed ticketholders whose seats were changed as a result of the theater being forced to reconfigure its seating arrangement at

---

[8] See, e.g., Pediatrix Screening, Inc. v. TeleChem Int'l, Inc. 602 F.3d 541, 548-49 (3d Cir. 2010), and Reardon v. Allegheny Coll., 926 A.2d 477 (Pa. Super. 2007).

the request of the fire marshal was properly dismissed since theater's failure to provide the promised seating was merely a breach of its contractual duty, created by the issuing of the ticket, to furnish a particular seat).

The Brunos next review various decisions of the Superior Court, discussed at greater length herein, in which they assert that tribunal articulated and applied different formulations of a gist of the action analysis in determining whether a particular cause of action was contractual or tortious in nature. See Brunos' Brief at 16-18 (comparing Bash v. Bell Tel., 601 A.2d 825 (Pa. Super. 1992) (viewing critical difference between tort and contract actions as dependent on whether duty breached was imposed by the agreement of the parties, or imposed by law as a matter of social policy, and holding that customer's negligence claim against telephone company for failing to print advertisement in yellow pages directory for which customer had contracted was properly dismissed under the gist of the action doctrine, as the duty allegedly breached was a private contractual one), and eToll Inc. v. Elias/Savion Adver., 811 A.2d 10, 21 (Pa. Super. 2002) (holding that plaintiff's claims of fraudulent practices against the defendant were barred by the gist of the action doctrine since they either arose from the performance of the contractual relationship, or were grounded therein, and, thus, "not so tangential to the parties' relationship so as to make fraud the gist of the action," but rather, "inextricably intertwined with the contract claims.").

The Brunos contend that eToll was "wrongly decided," and they assail its inquiry as to whether the acts in question were "tangential to the parties' relationship" as "a very murky and expansive test" of little guiding value to courts, and posit the application of this test will result in the wrongful dismissal of many valid tort claims. Brunos' Brief at 17. The Brunos proffer that the more relevant inquiry is that undertaken in Bash, which seeks only to determine whether the breach of duty alleged in a particular complaint is

the breach of a private duty created by contracting parties, rendering it an action for breach of contract, or whether the breach of the duty alleged is that imposed by law as a matter of social policy, in which case the action must be regarded as sounding in tort.

Elaborating thereon, the Brunos argue that the fundamental question a court must answer in a gist of the action case is: "What's this case really about?" Brunos' Brief at 18. The Brunos note that a judicial assessment which focuses on the source of duty "will bar recovery if the duties underpinning the tort claim arose merely because the parties agreed to them. However, it will not prevent recovery when the wrongs alleged do not arise out of duties imposed by [the parties'] contract." Id. at 19. In the Brunos' view, the mere fact that a contractual relationship brought the tortious wrongdoer "in the door," so to speak, should not result in the tort claim being automatically disqualified under the gist of the action doctrine. Id. at 20.

The Brunos advocate that, if our Court formally adopts the doctrine, it should do so in the manner delineated by the Superior Court in Bash — i.e., focus the inquiry only on the source of the duty — and not introduce, as a confounding concept, the question of whether the tort and contract actions are "inextricably intertwined" as the eToll court did, and, as some federal courts following Pennsylvania law have done. Brunos' Brief at 21 (citing Galdieri v. Monsanto, 245 F. Supp. 2d 636, 650 (E.D. Pa. 2002) (dismissing misrepresentation claim which was "intertwined" with claims for breach of contract)). The Brunos assert that such an approach appears to conceptually require tort and contract claims to be bound so tightly together that separating them would be impossible — a process they liken to the difficulty one would encounter in separating the multiple colored strands of fabric in a garment; however, according to the Brunos, this formulation has, in reality, encouraged courts to erroneously conclude that if there is any contract involved with the conduct giving rise to the claim then there can be no tort

liability, even if there is only an attenuated link between the alleged tort and the parties' contractual duties. The Brunos urge us to preserve the traditional distinction between tort and contract claims which Bash recognized and not allow the gist of the action doctrine to be expanded to extinguish valid tort claims.

Turning to the facts of the instant case, the Brunos contend that the lower courts erred in finding their negligence claim against Erie barred by the gist of the action doctrine. The Brunos acknowledge that Erie's adjuster and its engineer were present at their house as a result of the insurance contract — the homeowner's policy. However, the Brunos argue that their claim is not predicated on a breach of the adjuster's and engineer's duties under that policy, which were limited to determining whether the mold constituted a covered loss as defined by the policy and to ascertaining the cost of fixing it; rather, the Brunos maintain their action is predicated on the statements of Erie's adjuster and the engineer regarding the toxicity of the mold, which they describe as "gratuitous," and not part of any relevant inquiry into Erie's contractual liability. Brunos' Brief at 29.

In support, the Brunos highlight various factual assertions in their complaint against Erie — namely, that Erie, through the actions of its adjuster and engineer: (1) misdiagnosed the mold as not being dangerous; (2) dismissively minimized the danger of the mold; and (3) recommended that the renovation work continue, which exposed additional mold. The Brunos characterize all of these actions as "well outside" the scope of Erie's contractual duties, inasmuch as the contract of insurance did not require Erie to determine the mold's toxicity, or to render advice about whether Mr. Bruno should continue to remove the paneling in light of its discovery. The Brunos maintain that, because Erie's liability under the policy, by its terms, only required it to pay up to $5,000 for direct physical loss to the property and additional living expenses in

connection with the presence of mold, it was "of no contractual importance whether the mold discovered . . . was toxic, [or] non-toxic." Therefore, they reason, it was improper for the Superior Court to conclude that the duties purportedly breached by the acts of Erie's adjuster and engineer in rendering advice about the mold's toxicity were "'defined by the terms of the contract,'" Brunos' Brief at 30 (quoting Bruno, at 16). The Brunos assert that their claims that Erie's adjuster and engineer wrongly assured them that the mold posed no danger were not "created or grounded in the insurance contract;" id. at 30, but, rather, constituted a breach of "a societal duty not to affirmatively mislead or advise without factual basis." Id. at 28. (citing American Guarantee v. Fojanini, 90 F. Supp. 2d 615, 623 (E.D. Pa. 2000) (finding actions against individual for misrepresentations that his corporation was financially sound were "grounded in the general duty to exercise reasonable care in making representations that could result in reliance" and, thus, sounded in tort); Mendelsohn Drucker v. Titan Atlas Mfg., 885 F. Supp. 2d 767, 790 (E.D. Pa. 2012) (tort claim for fraudulent inducement of contractual relations not barred by the gist of the action doctrine since act of fraudulent misrepresentation "constitutes a breach of duty of honesty imposed by society, and not contractual duties").

Erie responds by noting that our Court has used the gist of the action doctrine to preserve a demarcation between tort and contract claims and not allow tort recovery for contractual breaches. Erie's Brief at 11 (quoting Glazer v. Chandler, 200 A.2d 416, 418 (Pa. 1964) ("To permit a promisee to sue his promissor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions."). Erie endorses the Superior Court's formulation of the doctrine, reflected in its decisions discussed above, which focuses on the source of the duty in determining whether the gist or gravamen of the action sounds in tort or contract.

In Erie's view, such a test gives trial courts appropriate guidance, while, at the same time, allows them sufficient flexibility to do what is a highly fact intensive analysis that considers the nature of the action as a whole, not merely discrete acts of conduct. Erie requests that the test not be made more restrictive, in order to prevent contract claims being recast as tort claims through what it terms "artful pleading." Erie's Brief at 13.

In regards to the case at bar, Erie suggests that both lower courts properly applied the gist of the action doctrine to dismiss the Brunos' complaint against it. Erie notes that, in Pennsylvania, a policyholder who is not pleased with the manner in which claims are handled by an insurer may sue only in contract, but that our Court in D'Ambrosia v. Penn. Nat'l. Ins. Co., 431 A.2d 966 (Pa. 1981), previously refused to judicially create a tort action at common law for actions taken by an insurer in "bad faith" when processing a claim, which is why the legislature had to create a separate statutory cause of action to penalize an insurer for such conduct. See 42 Pa.C.S.A. § 8371. Erie asserts that an insurer has no duty of care in investigating and handling insurance claims, and, thus, there can be no breach of such duty which would be cognizable in a tort action.

Erie, citing three unpublished decisions from federal district courts in Pennsylvania, contends that all three courts have used the gist of the action doctrine to bar tort claims against insurance carriers for their actions in handling a claim under an insurance policy, on the basis that the pleadings, although alleging negligent acts, were merely claiming the insurers breached duties created by the insurance contract. Erie's Brief at 15-18 (citing Cimildoro v. Metro. Prop. and Cas. Co., 2010 WL 891838 (E.D. Pa. 2010) (dismissing allegation that insurer negligently employed contractor to perform repair work on her home pursuant to policy, but also allowing claim against contractor to proceed on tort theory); Lindsey v. Chase Home, 2006 WL 2524227 (M.D. Pa. 2006)

(dismissing claim that insurer was negligent for failing to pay flood insurance premiums as required by insurance contract since insurer had no duty to pay premiums except because of the contract); Allstate v. Lombardi, 2009 WL 1811540 unpublished decision (W.D. Pa. 2009) (dismissing claims that insurer failed to properly investigate and handle claim, deliberately caused unwarranted delay, and concocted the application of an exclusion barred because these allegations stemmed from the contractual relationship between the parties).

Erie maintains that these cases exemplify the principle that causes of action arising from insurance contracts are properly brought as breach of contract claims, and that a mere allegation of tortious conduct by the insurer during performance of the contract does not transform the cause of action into one for tort. Erie avers that the only duties it owed the Brunos arose from the contract itself, and that it could not breach any duty of care to the Brunos in relation to the opinions offered by the adjuster and Rudick's engineer since it had no duty of care to the homeowner with respect to that advice, which it likens to "a neighbor expressing his opinion about mold and its characteristics." Erie's Brief at 19. Erie proffers that its adjuster and the engineer were in the Brunos' home only because of their contractual relationship, and their responsibility for assessing water damage and the presence of mold was done only in order to process the Brunos' claim for benefits. Erie argues the adjuster and engineer were not in the Brunos' home for the purposes of risk assessment or to advise them on the construction project; thus, neither the adjuster nor engineer had any duty of care to the Brunos on which a negligence claim could be based.

Erie claims that, absent the insurance contract, it would have had no duty to the Brunos at all, as it disclaims the existence of any special relationship with its insureds which would give rise to a duty independent of that created by its policies. Erie also

suggests that the Brunos' negligence claim does not rest solely on the statements of its adjuster and engineer to Mr. Bruno, as they claim in their brief, but rather on all of the aforementioned allegations of negligence in their complaint which they contend should be examined, *in toto*, to determine whether the action sounds in contract or tort. Erie asserts that, upon such examination, it becomes clear the true gist or gravamen of this action is a breach of contract, and that the Brunos are merely attempting to improperly recast it, through artful pleading, as one in tort.[9]

---

[9] The Pennsylvania Association for Justice ("PAJ") has submitted an *amicus* brief in which it recognizes the utility of the gist of the action doctrine in preventing contract claims from being brought as tort actions; however, PAJ cautions that the doctrine, in its current form, does not provide a clear and understandable tool to separate genuine contract claims from tort ones, nor does the doctrine acknowledge that there are some situations where certain relationships may be established by contract, such as physician and patient, and landlord and tenant, but actions taken in the course of the contractual relationship may also give rise to tort liability in addition to a claim for breach of contract. Because of the potential confusion in the application of this doctrine, PAJ advocates using only the traditional pretrial tools afforded by the rules of civil procedure, such as motions for judgment on the pleadings or summary judgment, to weed out putative tort claims that are not actionable. Alternatively, PAJ urges that our Court restrict the application of the gist of the action doctrine to situations "where . . . the only basis of a tort duty is in a contract between the parties and . . . where the duty does not involve larger social policies embodied in the law of torts." PAJ Brief at 12 (emphasis original).

The Pennsylvania Defense Institute and the Insurance Federation of Pennsylvania ("PDI/IFP") have filed a joint *amicus* brief in which they assert that our Court should not consider the preliminary question of whether the gist of the action doctrine should be recognized as part of Pennsylvania law since, in their view, it is an "intellectual exercise because the . . . parties are in agreement on the fundamental purpose of the doctrine." They also argue, somewhat quizzically, that the Brunos waived the question of whether the gist of the action doctrine should be adopted since they fail to "develop any argument for the repudiation of that doctrine." PDI/IFP Brief at 6-7. PDI/IFP further take the position that, in any event, the gist of the action question is moot, since, in their view, the Brunos have no viable negligence claim which they can assert against Erie. PDI/IFP maintain that the Brunos have already pled bad faith claims against Erie in their complaint which they view as a sufficient basis to obtain extra-contractual remedies.

## B. The Gist of the Action Doctrine in Pennsylvania

Our Court has had scant occasion to opine as to how the gist of the action doctrine should be employed to ensure that a party does not bring a tort claim for what is, in actuality, a claim for a breach of contract. We have, nevertheless, rendered a number of prior decisions in which we have articulated the fundamental tenets of this doctrine and applied it to resolve other legal questions in which the distinction between the underlying action being a tort or contract claim was dispositive. We, therefore, begin with a discussion of those decisions, as they illustrate how this doctrine has been traditionally utilized by our courts to distinguish between tort and contract claims.[10]

As early decisions of our Court involving the gist of the action doctrine were guided by legal principles derived from the English common law, a brief history of the development of those principles thereunder is instructive. A leading authority on the law of torts, Dean William Prosser, has noted that, from its inception, and for centuries thereafter until the mid-1300s, the English common law recognized no distinction between actions in tort and actions in contract, inasmuch as the form of the action, as set forth by the parties in their writs or pleadings, was deemed controlling of how a civil case proceeded through the English court system. However, as commerce became more sophisticated, certain cases began to arise where injuries occurred during the course of business relationships between parties, such as horses being drowned during

---

[10] Inasmuch as we accepted review only to resolve the narrow question of whether the the Brunos' negligence claim, as pled in their complaint, was barred by the gist of the action doctrine as the lower courts found, contrary to the suggestion of *amici* PDI/IFP, the question of whether that claim is otherwise legally viable is not before us and, hence, does not impact our consideration of this issue. Further, we reject the proposition advanced by these *amici* that undertaking to clarify the application of the gist of the action doctrine in Pennsylvania constitutes a mere "intellectual exercise" in this instance. PDI/IFP Brief at 7. As part of our determination of the issue we accepted for review, we must, necessarily, explicate the governing legal principles.

transportation or injured during shoeing, customers of incompetent barbers sustaining disfiguring facial injuries during shaving, patients suffering grievous bodily injury from shoddy surgical practices, and homes being rendered dangerous or uninhabitable as the result of carpenters' lack of skill in performing construction. Prosser, Selected Topics on The Law of Torts, 381-82 (Fourth Series 1954).

The theories of the various civil actions by which plaintiffs who suffered such losses sought recovery sounded in tort as they were based on the concept of a breach of the duty imposed by the law to exercise care in providing the service. Gradually, however, the English court system began to also recognize separate actions for "assumpsit" arising out of business relationships, which were based on the concept of a defendant being liable for a breach of the duty created by the defendant "undertaking" to render services to the plaintiff, in exchange for monetary consideration. These actions eventually evolved to the point that they became the exclusive vehicle for parties to pursue remedies for breaches of executory promises in their contracts. Id. at 382-84.

Nonetheless, the development of these contractual actions did not extinguish a party's right to also bring tort actions in circumstances whenever such actions had been previously recognized. Id. at 384. According to Dean Prosser, "[o]nce it was clear that assumpsit would lie for any breach of contract, but that in certain situations there might still be a remedy in tort, the English courts began to be beset with problems." Id. at 385-86. A bewildering array of decisions followed from those tribunals as they attempted to distinguish tort and contract actions, but they offered no clear principle of demarcation. Eventually, an act of the English Parliament created a division between those actions "founded upon tort" and those "founded upon contract" for purposes of determining jurisdiction of the English courts of common pleas and the costs recoverable in a particular civil action. Id. at 386-87. This compelled the English courts to, thereafter,

undertake an examination of the character of each action in order to give it an appropriate classification. American courts, following the English decisions in this area, also adopted this approach by focusing on the substance, i.e., the gist, of a cause of action, in order to determine whether it stated a claim in tort or in contract. Id.

The seminal decisions from our Court articulating and applying the gist of the action doctrine were rendered in the 1800s, and the doctrine was utilized in those cases to distinguish a breach of contract claim from a tort claim for purposes of ascertaining which court had jurisdiction over a particular action, due to the fact the law at that time gave jurisdiction over contract claims valued at less than $100.00 to justices of the peace, as opposed to courts of common pleas which had jurisdiction over all tort claims irrespective of the dollar value of the injury.

The first of these cases is Zell, which was decided in 1830. In Zell, the plaintiff owned a particular piece of land and entered into a contract with the defendant — a millwright — to construct a clover mill and, also, to dig a channel in the bed of a stream running across the plaintiff's land, so that it would divert the stream's current to flow to the mill, and, additionally, would bring the elevation of the stream's waterflow level with the top of a dam across the stream. The defendant built the mill and dug a channel in the streambed; however, the manner in which the defendant constructed the channel inhibited the stream's water from flowing to the mill and, also, created a 16-inch grade between the bottom of the stream and the top of the dam. Because both of these conditions rendered the mill nonfunctional and, hence, useless to the plaintiff, plaintiff brought suit against defendant.

In his pleading, plaintiff asserted the existence of the contract with defendant and its aforementioned terms, and also alleged that the defendant "negligently, carelessly, and unskillfully, graded and laid off said race and water-course, and built said mills; and

so inaccurately and erroneously governed himself therein, and for want of due care and skill" such that it deprived plaintiff of the use of the improvements and the land. Zell, 1830 WL 3261 at *1. After a jury verdict for the plaintiff in the amount of 6 cents, the trial court awarded costs which, under the extant law, it was not empowered to do for a verdict of that sum if the action was in *assumpsit*, i.e. breach of contract, which defendant contended the suit, in actuality, was.

On appeal, in order to determine whether the trial court properly had jurisdiction over the matter, our Court considered the question of the true nature of the suit and found that, while the suit may have arisen because of the existence of the contract between the parties, this fact, in and of itself, did not render it an action for breach of contract. Our Court noted that the true subject matter of the allegations in the complaint did not relate to the defendant's failure to perform his contractual obligations, but, rather, were allegations that he had performed those obligations in a negligent or careless manner. We explained:

> The gist of an action on the case[11] like the present, is not a failure to *perform,* but a failure to perform in a *workmanly manner,* which is a *tort*. . . . An undertaking for skill and diligence is implied no further than to raise a *duty,* the BREACH of which is the *gravamen* and meritorious cause of the action. The difference between *assumpsit* which is an action directly on the contract, and *case* which is collateral to it, is shewn by the pleadings . . . These are sometimes concurrent remedies; as in an action against a carrier who may be made to respond either immediately on the contract which affords a specific ground of action, or on the custom which raises a duty to carry the goods safely; and as the one or the other form is adopted, so may the count be joined with other counts sounding in contract or *tort.* In all cases where the action is not on the contract, but for the breach of a

---

[11] An action in "case" was, under the common law of the era, considered an action sounding in tort. Krum v. Anthony, 8 A. 598, 600 (Pa. 1887).

collateral duty, the *gist* is a personal *tort;* as where a smith pricks a horse in shoeing, or a farrier kills him by bad medicines or neglect: and it is emphatically the *gravamen* in an action against a barber for barbering his customer *negligenter et inartificialiter*. That the defendant's liability arose remotely out of a contract, therefore, is by no means decisive of the question.

Zell, 1830 WL 3261 at *3 (emphasis original, citations omitted).

Consequently, with this decision, our Court endorsed the principle that merely because a cause of action between two parties to a contract is based on the actions of the defendant undertaken while performing his contractual duties, this fact, alone, does not automatically characterize the action as one for breach of contract. To the contrary, Zell established that the *nature* of the duty breached, as alleged in the plaintiff's pleadings, is determinative of the gist of the action; hence, actions arising "directly" from an alleged breach of a contractual duty were to be regarded as being in contract; whereas, those actions based on an alleged breach of a contracting party's separate "collateral" duty to perform a contractual obligation with skill and diligence were to be considered as being in tort.

In the subsequent case of McCahan v. Hirst, 7 Watts 175, 1838 WL 3224 (Pa. 1838), also involving a question of jurisdiction, our Court elaborated on the character of the alleged breach of duty which would render a particular cause of action a breach of contract — "nonfeasance" — or a tort — "misfeasance." In that case, the plaintiff alleged in his complaint that the defendant "carelessly, negligently and improperly" stored and handled five bushels of cloverseed which the plaintiff delivered to the defendant to store pursuant to a contract of bailment, and which was later lost by the defendant while in his custody. 1838 WL 3224, at *1. Despite the fact that these claims

sounded in negligence, our Court explained that the true nature of the action was based on an alleged breach of the specific duty imposed by the bailment contract, rather than, as in Zell, an alleged breach of the general duty to perform the contractual obligations of the construction contract in a non-negligent fashion:

> [T]he cause of action [in Zell] was considered substantially a *misfeasance;* but here it cannot, at most, be made to amount to more than a *nonfeasance;* which latter, properly speaking, is the non-performance of a duty; and whenever such duty arises, as it does here, out of a contract, the non-performance of it becomes, and in reality is, nothing more or less than a non-performance or breach of the contract imposing the duty. Hence the contract is the real foundation of the cause of action, which must be considered as arising immediately from the breach of it. But a *misfeasance* is a *trespass* or *wrong* committed, which, in contemplation of law, has no relation to a contract in any case.

McCahan, at 3 (emphasis original). McCahan therefore established that, whenever a plaintiff's complaint sets forth allegations which substantially constitute assertions of a defendant's complete failure to perform duties originating from a contract — a nonfeasance — the plaintiff's action will be deemed to be a breach of contract; whereas, if the allegations substantially concern the defendant's negligent breach of a duty which exists independently and regardless of the contract — a misfeasance — then the action will be regarded as one in tort.[12]

---

[12] As a leading treatise on the law of torts, coauthored by Dean Prosser, observes, this nonfeasance/misfeasance distinction was the earliest line of division developed by American courts to differentiate between tort and contract actions. Used in this context, misfeasance means more than complete non-performance of a contractual duty, and thus encompasses situations where a party *attempts* performance of a contractual obligation, but does so improperly or without reasonable care. W. Page Keeton, Prosser and Keeton on Torts 659-60 (5th ed. 1984) (hereinafter "Prosser and Keeton").

Thereafter, our Court employed the gist of the action doctrine to differentiate between contract and tort actions for purposes other than determining jurisdiction, but, again, we utilized the nature of the duty alleged to have been breached as the basis for classifying the particular action at issue. In the first such case, Cook v. Haggarty, 36 Pa. 67, 1859 WL 8877 (Pa. 1859), we were asked to ascertain whether a type of responsive pleading, typically filed in contract actions, was permitted in response to plaintiff's complaint which sounded in tort. The foundation of the controversy in that matter was a contract between the parties which obligated the defendant to "safely keep, pasture, and specially care for, and attend to" plaintiff's horses. 1859 WL 8877 at *1. When the horses sustained injury during defendant's care, the plaintiff brought an action alleging that the defendant "conducted himself so carelessly, negligently and improperly . . . in and about the keeping and pasturing, caring for, and attending to the horses." Id. at *3. Though the plaintiff characterized this action as one in tort, the trial court permitted the defendant to raise contractual defenses on the grounds that the plaintiff's complaint was not an action in tort, but rather for an alleged breach of the contract of bailment. Our Court found that, because the duty the plaintiff alleged the defendant to have breached was the very same as that described by the contract, the contract was the origin of the duty alleged to have been breached, and we concluded there was no error in treating it as a breach of contract for purposes of allowing the responsive pleading.

Next, in Krum, supra, we applied the gist of the action doctrine to overturn a judge's instruction to the jury which was based on his misapprehension of the nature of the underlying action. In that case, the parties had a contract which required the defendants to maintain a fence between their property and the plaintiff's adjoining lands, but the defendants neglected to perform any upkeep and permitted the fence to fall

down, and they also removed a portion of the fence in conjunction with quarrying activities which encroached on the border of the plaintiff's lands. One night, the plaintiff put his horse out to pasture on his lands, but, because of the absence of fencing, the horse wandered onto the defendants' land and tumbled to its death in the quarry. The plaintiff commenced an action to recover the value of the loss of the horse, which he asserted resulted from the defendants' negligence. The trial court refused to charge the jury on the issue of contributory negligence because, in its view, it was the contractual duty of the defendants to maintain the fence, and it informed the jury that the defendants' liability to the plaintiff, if any, was premised on their failure to perform this contractual duty. Our Court reversed. We found the mere existence of a contract between the parties, which obligated the defendants only to maintain the fence, did not preclude a tort action based on the defendants' negligence, generally, in creating the dangerous condition (the open quarry pit) which was the true nature of the action. See id. at 600 ("The action was not brought to recover damages for the breach of a contract to maintain a fence. On the contrary, it was an action of case sounding in tort to recover damages for the loss of a horse resulting from the negligence of the defendants. This negligence is the very gist of the action.").

Thereafter, in the Twentieth Century, our Court applied the gist of the action doctrine to determine whether a plaintiff could seek a tort remedy for actions taken by a party with whom he or she contracted, or whether the plaintiff was limited to seeking redress through a breach of contract action. In Horney, a decision rendered in 1905, our Court, while not expressly characterizing it as such, employed a gist of the action analysis to determine whether the plaintiff could maintain a tort action for "inconvenience and annoyance and mortification and indignity and humiliation suffered" against the defendants who were managers of a theater, as the result of their failure to

provide the specific seats for which the plaintiff had purchased tickets. 61 A. at 1089. In affirming the trial court's entry of a directed verdict for the defendants on the basis of its determination that the plaintiff could not recover in tort for the defendants' failure to honor the original tickets, as issued, we noted that, as a general matter, a purchase of a theater ticket merely creates a contractual duty on the part of the seller for the seller to furnish the purchaser a particular seat. Consequently, we found that the defendants, as sellers of the tickets, had only the contractual duty to the plaintiff, as purchaser, to give him the promised seats, and so the plaintiff's remedy was limited to seeking damages for breach of that duty.

We specifically contrasted this limited duty created by the parties' contractual relationship with the general duty of service owed by a "common carrier," such as a railroad or bus company, to the public, which duty "is implied by law by reason of the relation of the parties." Id. We observed that, because of the general nature of that duty, a tort recovery would be available to anyone aggrieved by the common carrier's breach thereof, in addition to a recovery on the carriage contract. Thus, Horney is notable for establishing that, as a matter of law, a negligence suit may not be brought for breaches of what are purely contractual duties, but also for embracing the corollary principle that a claim may be brought against a party for actions taken in performance of contractual duties, if those actions constitute a breach of a general duty of care created by law and owed to all the public.

Over sixty years later, in Reitmeyer v. Sprecher, 243 A.2d 395 (Pa. 1968), our Court specifically recognized a cause of action in tort based on a party's violation of a duty owed to the public at large, by failing to fulfill a promise which was contractual in nature. In that case, a landlord promised his tenant, during lease negotiations, that he would repair a defective porch after the tenant took possession and repeated this

promise once the lease was executed. The landlord failed to fulfill this promise, however, and the tenant was subsequently injured when the porch collapsed. She then filed a complaint seeking recovery in tort from the landlord for her injuries, but the trial court sustained the landlord's demurrer to the complaint on the basis that Pennsylvania had, heretofore, only permitted an action for breach of contract in such situations.

Our Court reversed and recognized the right of the tenant to proceed with her tort claim, based on our conclusion that the gist of that claim was the landlord's negligence for breaching a general legal duty by failing to fulfill his promise to repair, not for a breach of the contract created by the promise itself. We explained:

> Under the instant circumstances, a duty on the part of the landlord arose to repair and render safe the defective condition of the premises and if, as alleged, physical harm was caused to the tenant, by a breach of the landlord's promise to repair, liability in tort on the part of the landlord should arise. As we said in Evans v. Otis Elevator Co., 403 Pa. 13, 18, 168 A.2d 573, 575 (1961):[13] 'It is not the contract *per se* which creates the duty; it is the law which imposes the duty because of the nature of the undertaking in the contract.'

Id. at 398.

As the parties have discussed in their briefs, the Superior Court has fully embraced the gist of the action doctrine as a means of determining whether a putative tort claim is barred because its substance is, in actuality, a claim for breach of contract. That tribunal has also employed a source of duty analysis similar to that described in our cases discussed above as the basis for differentiating between tort and contract

---

[13] In Evans, our Court found that the defendant, an elevator repair company, had a general duty of care, imposed by law, "to perform his contractual undertaking in such manner that third persons — strangers to the contract — will not be injured thereby." 168 A.2d at 575 (citing Prosser and Keeton, 514-519 (2d ed. 1955)).

actions, with some variation. In the leading case by that tribunal in this area, <u>Bash</u>, <u>supra</u>, the plaintiff — a dentist — contracted with the publisher of a "yellow pages" telephone directory to place an advertisement therein, but the publisher failed to include the ad when the directory was printed. The plaintiff sued the publisher, *inter alia*, for both breach of contract and in tort seeking damages for "emotional distress, mental anguish, embarrassment and depression" based upon the publisher's failure to perform the agreed upon contractual terms. 601 A.2d at 829. The trial court dismissed the tort claim and permitted only the contract claim to proceed, and the Superior Court affirmed.

In its opinion, the court adopted the reasoning of two Pennsylvania federal district court decisions, first noting:

> [I]t is possible that a breach of contract also gives rise to an actionable tort. . . . 'To be construed as in tort, however, the wrong ascribed to defendant must be the gist of the action, the contract being collateral.' . . . A claim [in contract] cannot be converted to one in tort simply by alleging that the conduct in question was wantonly done.

<u>Bash</u>, 601 A.2d at 829 (quoting <u>Closed Circuit Corp. of Am. v. Jerrold Electronics</u>, 426 F. Supp. 361 (E.D. Pa. 1977)). The court then endorsed a duty-based differentiation between tort and contract actions:

> Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals.

<u>Bash</u>, 601 A.2d at 829 (quoting <u>Iron Mountain v. American Specialty Foods</u>, 457 F. Supp. 1158 (E.D. Pa. 1978) (internal citations and quotations omitted)). Applying these principles, the court deemed the obligations of the parties to be "defined by the terms of the contract, and not by the larger social policies embodied in the law of torts." <u>Id.</u> at

830, and, hence, ruled that the plaintiff was limited to seeking recovery of damages arising out of the breach of that contract.

Subsequently, in eToll, supra, the Superior Court seemingly added an extra consideration to the Bash analysis by utilizing an additional criteria to differentiate between contract and tort claims brought in the same action — i.e., whether they are "inextricably intertwined." 811 A.2d at 21. In that case, the plaintiff — an email provider — filed suit for breach of contract and for the tort of fraud against an advertiser, with which it had contracted to perform marketing and advertising services, for stealing money by making unauthorized and excessive contracts for goods and services with third party vendors, and accepting payments for services which were not performed. The Superior Court, while reiterating the above referenced considerations relied on in the Bash decision, also recognized, from federal district court opinions, four situations under which those courts found the gist of the action doctrine bars a putative tort claim: (1) where the tort claim "aris[es] solely from a contract between the parties"; (2) where "the duties allegedly breached were created and grounded in the contract itself"; (3) where "the liability stems from a contract"; or (4) where the tort claim "essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." eToll, 811 A.2d at 19 (citations omitted).

The court ultimately found that the plaintiff's fraud claims arose "in the course of the parties' contractual relationship," "[defendants]' duties regarding billing and performance were created and grounded in the parties' contract," and the damages sought were "the types of damages which would be compensable in an ordinary contract action." Consequently, the court held that the claims were barred because they were "not so tangential to the parties' relationship so as to make fraud the gist of the action," but, rather, were "inextricably intertwined with the contract claims." Id. at 20-21.

Subsequent decisions of the Superior Court assessing whether a particular tort claim between contracting parties is barred by the gist of the action doctrine have taken varied approaches.  In some cases, the court has used the more straightforward analysis set forth in Bash and examined whether the duty allegedly breached was created by the contract itself, or, instead, is in the nature of a broader duty owed to others imposed as a result of the social policy reflected in the law of torts.  See, e.g., Reed v. Dupuis, 920 A.2d 861, 866 (Pa. Super. 2007) (finding landlord had a legal duty to exercise reasonable care to fulfill her promise to correct a water infiltration problem which is "separate and distinct from her contractual duty").  In other cases, the court has followed the eToll approach and also examined whether putative tort claims are "inextricably intertwined" with breach of contract claims which the plaintiff also brought in the same action.  See, e.g., Pittsburgh Const. Co. v. Griffith, 834 A.2d 572, 584 (Pa. Super. 2003) (holding tort claim for conversion by commercial homebuilder against homeowners for their failure to release payment pursuant to construction contract was barred, since homebuilder had also filed a breach of contract claim, and such claims were "inextricably intertwined [with] the success of the conversion claim depending entirely on the obligations as defined by the contract.").[14]

The Commonwealth Court follows a different analysis, which rests on the same nonfeasance/misfeasance distinction our Court articulated in McCahan:

> If there is 'misfeasance,' there is an improper performance of
> the contract in the course of which breaches a duty imposed

---

[14]  Both the Third Circuit Court of Appeals, as well as some federal district courts, have looked to eToll as the controlling statement of Pennsylvania law in this area and have, in their analysis, found putative tort claims barred because they were "inextricably entwined" with breach of contract claims based upon the same conduct.  See, e.g., Addie v. Kjaer, 737 F.3d. 854 (3d Cir. 2013); Bancorp Bank v. Lawyers Title Ins. Corp., 2014 WL 3325861 (E.D. Pa. filed July 8, 2014).

by law as a matter of social policy. In such instances, the 'gist' of the plaintiff's action sounds in tort and the contract itself is collateral to the cause of action. On the other hand, if there is 'nonfeasance,' the wrong attributed to the defendant is solely a breach of the defendant's duty to perform under the terms of the contract. In such instances, the 'gist' of the plaintiff's action sounds in contract, and the plaintiff would not have a cause of action but for the contract.

Harleysville Homestead Inc. v. Lower Salford Twp. Auth., 980 A.2d 749 (Pa. Cmwlth. 2009). See also Pratter v. Penn Treaty American Corp., 11 A.3d 550 (Pa. Cmwlth. 2010).

As the foregoing discussion indicates, the fundamental principles comprising the gist of the action doctrine have long been an integral part of our Court's jurisprudence and have, at least in two cases — Horney and Reitmeyer — been employed by our Court for the purpose of determining whether a plaintiff may, as a matter of law, bring an action in tort for a defendant's alleged negligent acts committed during the existence of their contractual relationship. Likewise, the Superior and Commonwealth Courts have used this doctrine for the same purpose in their consideration of specific questions such as that presented by the case at bar — namely, whether a purported tort claim was properly dismissed by a trial court because the true gist or gravamen of the claim was for breach of a contract which existed between the parties.

The general governing principle which can be derived from our prior cases is that our Court has consistently regarded the nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint,[15] to be the critical determinative factor in determining whether the

---

[15] The facts that a court examines in this determination are necessarily dependent on when, procedurally, this inquiry is undertaken. Where, as here, the question is presented in a pretrial motion for a demurrer, the court considers only the well-pleaded facts in the parties' complaint. See MacElree, supra. However, if the question is (continued…)

claim is truly one in tort, or for breach of contract. In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, e.g., for negligence, is not controlling. If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract — i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract — then the claim is to be viewed as one for breach of contract. See McCahan; Cook; Horney. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort. See Zell; Krum; Reitmeyer; Ash v. Cont'l. Ins. Co., 932 A.2d 877, 885 (Pa. 2007) (holding that action against insurer for bad faith conduct pursuant to 42 Pa.C.S.A. § 8371 is for breach of a duty "imposed by law as a matter of social policy, rather than one imposed by mutual consensus"; thus, action is in tort); see also Prosser and Keeton at 656 (reviewing extant case law, and noting the division therein between actions in tort and contract based on the nature of the obligation involved, observing that "[t]ort obligations are in general obligations that are imposed by law on policy considerations to avoid some kind of loss to others . . . [which are] independent of promises made and therefore apart from any manifested intention of parties to a contract, or other bargaining transaction."); Tameny v. Atl. Richfield, 610 P.2d 1330, 1335 (Cal. 1980) ("Whereas contract actions are created to protect the interest in having promises performed, tort actions are created to protect the interest in freedom from

---

(…continued)

presented in subsequent contexts, such as in a motion for a directed verdict, which is what transpired in Horney, then the facts, of course, should be viewed in accordance with the applicable standard of review.

various kinds of harm. The duties of conduct which give rise to them are imposed by law, and are based primarily upon social policy." (quoting Prosser, <u>Law of Torts</u> 613 (4th ed. 1971)). Although this duty-based demarcation was first recognized by our Court over a century and a half ago, it remains sound, as evidenced by the fact that it is currently employed by the high Courts of the majority of our sister jurisdictions to differentiate between tort and contract actions.[16] We, therefore, reaffirm its applicability as the touchstone standard for ascertaining the true gist or gravamen of a claim pled by a plaintiff in a civil complaint.[17]

---

[16] See <u>Locke v. Ozark City Bd. Of Educ.</u>, 910 So.2d 1247 (Ala. 2005); <u>Thomas v. Cleary</u>, 768 P.2d 1090 (Alaska 1989); <u>Barmat v. John and Jane Doe Partners A-D</u>, 747 P.2d 1218 (Ariz. 1987); <u>Tameny</u>, <u>supra</u>; <u>A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.</u>, 114 P.3d 862, 866 (Colo. 2005); <u>Gazo v. City of Stamford</u>, 765 A.2d 505 (Conn. 2001); <u>Bishop v. Owens</u>, 272 P.3d 1247 (Idaho 2012); <u>Armstrong v. Guigler</u>, 673 N.E.2d 290 (Ill. 1996); <u>Cross v. Lightolier Inc.</u>, 395 N.W.2d 844 (Iowa 1986); <u>Brueck v. Krings</u>, 638 P.2d 904 (Kan. 1982); <u>Roger v. Dufrene</u>, 613 So.2d 947 (La. 1993); <u>Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc.</u>, 489 N.E.2d 172 (Mass. 1986); <u>Fultz v. Union-Commerce Assocs.</u>, 683 N.W.2d 587 (Mich. 2004); <u>Wild v. Rarig</u>, 234 N.W.2d 775 (Minn. 1975); <u>Billings Clinic v. Peat Marwick Main & Co.</u>, 797 P.2d 899 (Mont. 1990); <u>Zawaideh v. Nebraska Dep't. of Health and Human Servs.</u>, 825 N.W.2d 204, 213 (Neb. 2013); <u>Bernalillo Cnty. Deputy Sheriffs Ass'n v. Cnty. of Bernalillo</u>, 845 P.2d 789, 793 (N.M. 1992); <u>New York Univ. v. Continental Ins. Co.</u>, 662 N.E.2d 763 (N.Y. 1995); <u>Toone v. Adams</u>, 137 S.E.2d 132 (N.C. 1964); <u>St. Paul Fire & Marine Ins. Co. v. Amerada Hess Corp.</u>, 275 N.W.2d 304 (N.D. 1979); <u>Finnell v. Seismic</u>, 67 P.3d 339, 344 (Okla. 2003); <u>Conway v. Pac. Univ.</u>, 924 P.2d 818 (Or. 1996); <u>Schipporeit v. Khan</u>, 775 N.W.2d 503 (S.D. 2009); <u>Abi-Najm v. Concord Condominium, LLC</u>, 699 S.E.2d 483 (Va. 2010); <u>Bank of America NT & SA v. Hubert</u>, 101 P.3d 409 (Wash. 2004); <u>Gaddy Engineering Co. v. Bowles, et.al., LLP</u>, 746 S.E.2d 568 (W.Va. 2013); <u>Ferguson v. Coronado Oil Co.</u>, 884 P.2d 971 (Wyo. 1994).

[17] With respect to the Superior Court's <u>eToll</u> decision, we note that, because that court acknowledged in its opinion this source of duty distinction and incorporated it into its analysis, its consideration of whether tort and contract claims brought together in the same action are "inextricably intertwined" should be viewed in this context, i.e., as a determination of whether the nature of the duty upon which the breach of contract claims rest is the same as that which forms the basis of the tort claims.

Notably, and of relevance to the case at bar, our prior decisions in Zell and Krum underscore that the mere existence of a contract between two parties does not, *ipso facto*, classify a claim by a contracting party for injury or loss suffered as the result of actions of the other party in performing the contract as one for breach of contract. Indeed, our Court has long recognized that a party to a contract may be found liable in tort for negligently performing contractual obligations and thereby causing injury or other harm to another contracting party, see, e.g., Bloomsburg Mills v. Sordoni, 164 A.2d 201 (Pa. 1960) (finding evidence sufficient for jury to have concluded architect was negligent in failing to exercise reasonable care in performance of duties imposed by design contract), or to a third person, see, e.g., Evans, supra (elevator repair company liable for injuries to user of the elevator caused by its negligent performance of service contract with building owner); Farabaugh v. Pa. Turnpike Comm'n, 911 A.2d 1264 (Pa. 2006) (recognizing claim for negligence against construction company for injuries to a third person caused by company's allegedly deficient performance of its contractual duty of inspection).

Consequently, a negligence claim based on the actions of a contracting party in performing contractual obligations is not viewed as an action on the underlying contract itself, since it is not founded on the breach of any of the specific executory promises which comprise the contract. Instead, the contract is regarded merely as the vehicle, or mechanism, which established the relationship between the parties, during which the tort of negligence was committed. See Zell, 1830 WL 3261, at *3 (considering action to be in tort since it was for breach of the defendant's duty to perform, in a "workmanly manner," construction activities specified by the construction contract); Evans, 168 A.2d at 575 ("It is not the contract *per se* which creates the duty [to avoid causing injury to third parties]; it is the law which imposes the duty because of the nature of the

undertaking in the contract."); <u>Reitmeyer</u> (negligence action was based on landlord's alleged breach of his independent duty of care imposed by law, which arose because of the parties' establishment of a contractual relationship through the formation of the lease agreement, not for a breach of a duty created by the agreement itself).

**C. Analysis**

We now apply these principles to the case at bar. Because this case comes to us in the procedural posture of a pretrial ruling on a demurrer, we consider whether the relevant facts, as pled in the Brunos' negligence claim against Erie for the actions of its agents — its adjuster and engineer — and accepted as true, as our standard of review requires, <u>MacElree</u>, <u>supra</u>, state a claim for Erie's breach of a contractual obligation created by the policy of insurance, or, rather, for a breach of an independent social duty imposed by the law of torts. The homeowners' policy required Erie to pay up to $5,000 to the Brunos, when their home sustained a direct physical loss as the result of mold, for the cost of: (1) removing the mold, including tearing out or replacing parts of the property in order to gain access to the mold; (2) testing the air inside the property, or the property itself, to confirm the presence of mold; and (3) any increased expenses incurred by the Brunos to maintain their standard of living, if the subject property was rendered uninhabitable by the mold. The Brunos' claim against Erie for its alleged actions at issue in this appeal, quite simply, is not based on Erie's violation of any of these contractual commitments. The Brunos do not allege that Erie failed to pay the $5,000 it was obliged to pay by the policy for the costs of testing and remediation of damage to the property, and, indeed, the parties agree that Erie did, in fact, pay the Brunos the $5,000 it owed under the policy for these purposes.

Instead, the Brunos' claim against Erie is predicated on the allegedly negligent actions taken by its agents on behalf of Erie <u>while</u> they were performing Erie's

contractual obligation to investigate the claim made by the Brunos under their policy in order to determine if the mold discovery triggered any of Erie's aforementioned payment obligations. Specifically, as recounted supra, the Brunos asserted in their complaint that Erie's agents, while conducting the claim investigation, were negligent for: rendering unfounded advice to the Brunos that the mold was "harmless," denying the potential for adverse human health consequences posed by the Brunos' exposure to the mold; and telling them that they "should continue tearing out the existing paneling." Complaint, 8/30/10, at 6. The Brunos further aver that, because of this advice and recommendation, they proceeded with the removal of the basement paneling, which later led to them suffering health problems from the mold exposure, and their entire house being rendered uninhabitable such that it had to be destroyed.

Accordingly, while Erie had contractual obligations under its policy to investigate whether mold was present, and also to pay for all property damage caused by mold, the substance of the Brunos' allegations is not that it failed to meet these obligations; rather, it is that Erie, during the course of fulfilling these obligations through the actions of its agents, acted in a negligent manner by making false assurances regarding the toxicity of the mold and affirmatively recommending to the Brunos that they continue their renovation efforts, which caused them to suffer physical harm because of their reasonable reliance on those assurances. Consequently, these allegations of negligence facially concern Erie's alleged breach of a general social duty, not a breach of any duty created by the insurance policy itself. The policy in this instance merely served as the vehicle which established the relationship between the Brunos and Erie, during the existence of which Erie allegedly committed a tort. We, therefore, reverse the order of the Superior Court affirming the trial court's dismissal of the Brunos'

negligence claim on the basis of its application of the gist of the action doctrine.[18] However, because of its conclusion that the Brunos' negligence claim against Erie was entirely foreclosed by the gist of the action doctrine, the Superior Court did not, in the proceedings below, fully consider the remainder of the parties' arguments to that tribunal regarding whether such a claim was otherwise legally cognizable, and, thus, we remand this case to that court for further consideration of these matters.

### III. Dismissal of Complaint against Rudick for Failure to File A Certificate of Merit.

We now turn to the second question upon which we granted review, namely, whether the Brunos were required to file a certificate of merit to proceed with their claim against Rudick even though they were not in contractual privity with that engineering firm.

### A. Arguments of the Parties

The Brunos argue that Pa.R.C.P. 1042.1 ("Rule 1042.1"), which defines the scope of the rules of civil procedure governing professional liability actions — including Pa.R.C.P. 1042.3 ("Rule 1042.3") — limits the requirement of the filing of a certificate of merit to only those professional liability claims which are asserted "by or on behalf of a patient or client of the licensed professional." See Pa.R.C.P. 1042.1(a). The Brunos

---

[18] We also reject the suggestion of Erie and PDI/IFP that the Brunos' negligence claim is somehow subsumed in their separate claim against Erie for bad faith. It is not, since the duty at issue in that claim is the statutorily created obligation of Erie to have acted in good faith with respect to payment of the Brunos' first party claims for property damage under their insurance policy. See Toy v. Metropolitan Life Ins., 928 A.2d 186 (Pa. 2007) (explaining that 42 Pa.C.S.A. § 8371 provides a remedy for an insurers' breach of duty to act in good faith when performing obligations under an insurance policy which includes, *inter alia*, paying a first party claim under the policy); Ash, supra, 932 A.2d at 885 (recognizing that legislature, through enactment of Section 8371, "formally impos[ed] a duty of good faith on insurers").

assert these terms should be given their plain and ordinary meaning, as required by Pa.R.C.P. 127 which governs the manner in which our rules of civil procedure are to be interpreted, and, thus, that Rule 1042.1 should be read as restricting the certificate of merit requirements of Rule 1042.3 to only those actions arising out of the course of a professional relationship between a patient or client and a licensed professional. The Brunos contend that no such professional relationship existed between themselves and Rudick as they were neither patients nor clients of Rudick, and they did not "hire, engage, contract with or pay for Rudick to come to their home[,] nor did Rudick report to them." Brunos' Brief at 41. Thus, the Brunos reason, the lower courts erred as they did not interpret these rules in accordance with their plain language, but, instead, interpreted them in accordance with what those tribunals viewed as the general spirit of the rules.

The Brunos reject this interpretation, which they note was based, in large part, on our Bilt-Rite decision. The Brunos argue that, while our Court recognized in Bilt-Rite that a third party action may lie against a professional without any privity of contract between the third party and professional, this decision cannot be interpreted as requiring a certificate of merit in those types of cases, as the need for such a certificate was not at issue, and, hence, not addressed by our Court. The Brunos lastly suggest they were reasonably relying on the plain language of the rule as currently written, and urge that, if we interpret it in a more expansive manner, that would constitute a change in the fundamental law which should only be applied prospectively — either through

caselaw, or a rule-change via the normal rulemaking process — but not to the instant matter.[19]

In response, Rudick echoes the policy-based rationale utilized by the lower courts and urges us to adopt the lower courts' broad interpretation of these rules, *dehors* their text, to require the filing of a certificate of merit when third parties, who are not patients or clients of a licensed professional, bring an action for negligence against the professional. In this regard, Rudick contends that the purpose of requiring a certificate of merit was, as articulated by our Court, to "weed non-meritorious malpractice claims from the judicial system efficiently and promptly." Rudick's Brief at 4 (quoting Womer, 908 A.2d at 275). Rudick urges that we reject an interpretation which is inconsistent with this purpose since, in its view, it would allow questionable claims against professionals to remain in the system generating unnecessary discovery and pleadings. Absent the certificate of merit requirement, Rudick suggests actions against professionals would multiply, generating what it terms discovery fishing expeditions. Rudick stresses what it views as the absurdity of interpreting these rules to require someone in direct privity who may be injured by a professional's negligence to obtain a certificate of merit, but relieving third parties, who are injured by the very same conduct, of that responsibility. It contends that this violates the canon of construction set forth in

---

[19] *Amicus* PAJ endorses the Brunos' suggested adoption of a plain meaning approach to interpreting these rules, and urges that we not focus on the perceived policy-based consequences of their interpretation as the Superior Court did. In PAJ's view, under the plain meaning of these rules, the Brunos were excused from having to obtain a certificate of merit to proceed with their suit against Rudick.

Pa.R.C.P. 128(a) against construing a rule of civil procedure in a manner which would produce an absurd result.[20]

## B. Governing Law and Analysis

Since this question involves the proper interpretation of the language of our rules of civil procedure, it is one of law, and, thus, our standard of review is *de novo*. Touloumes v. E.S.C., 899 A.2d 343, 346 n.4 (Pa. 2006).

The relevant portions of the rules at issue, Rules 1042.1 and 1042.3, provide:

> **Rule 1042.1. Professional Liability Actions. Scope. Definition**
>
> (a) The rules of this chapter [Pa.R.C.P. 1001, *et. seq*.] govern a civil action in which a professional liability claim is asserted by or on behalf of a patient or client of the licensed professional against
>
> (1) a licensed professional
>
>            \* \* \*
>
> (c) As used in this chapter, "licensed professional" means
>
> (1) any person who is licensed pursuant to an Act of Assembly as
>            \* \* \*
>     (vi) an engineer.

Pa.R.C.P. 1042.1(a), (c).

> **Rule 1042.3. Certificate of Merit**

---

[20] *Amici* PDI/IFP echo Rudick's assertion that the Superior Court's interpretation of the rule is consistent with its purpose — namely, to reduce the number of meritless professional malpractice suits — and that we should endorse that interpretation. *Amici* also point out that the term "client" is undefined in the rules of civil procedure, and, thus, could be read broadly to encompass third parties like the Brunos.

(a) In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party that either

(1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or

(2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or

(3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.

Pa.R.C.P. 1042.3(a) (internal explanatory notes omitted).

When interpreting the language of our rules of civil procedure, we are guided by the fundamental precepts set forth in Pa.R.C.P. 127. Touloumes, 899 A.2d at 346. This rule states:

**Rule 127. Construction of Rules. Intent of Supreme Court Controls**

(a) The object of all interpretation and construction of rules is to ascertain and effectuate the intention of the Supreme Court.

(b) Every rule shall be construed, if possible, to give effect to all its provisions. When the words of a rule are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

(c) When the words of a rule are not explicit, the intention of the Supreme Court may be ascertained by considering, among other matters (1) the occasion and necessity for the rule; (2) the circumstances under which it was promulgated; (3) the mischief to be remedied; (4) the object to be attained; (5) the prior practice, if any, including other rules and Acts of Assembly upon the same or similar subjects; (6) the consequences of a particular interpretation; (7) the contemporaneous history of the rule; and (8) the practice followed under the rule.

Pa.R.C.P. 127.

In particular, Pa.R.C.P. 127(b) governs our interpretation in this instance. It requires us to read Rules 1042.1 and 1042.3 in conjunction, in order to give the provisions of both rules their intended effect. In this endeavor, we also follow the cardinal tenet articulated in Pa.R.C.P. 103 that "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage," unless they have acquired a peculiar meaning, or are otherwise defined by another rule of civil procedure.

Applying these principles, it is evident that the plain language of Rule 1042.1 expressly cabins the application of the requirements of Rule 1042.3 for the filing of a certificate of merit to only those professional liability claims which are asserted against a licensed professional "by or on behalf of a patient or client of the licensed professional." Pa.R.C.P. 1042.1(a). A certificate of merit is not, therefore, required for professional liability actions brought by plaintiffs who are not patients or clients of a licensed professional. This construction is supported by the fact that the prior version of Rule 1042.1 — in effect from 2003 to 2008 — was much broader in scope, providing: "The rules of this chapter govern a civil action in which a professional liability claim is

asserted against a licensed professional." Pa.R.C.P. 1042.1(a) (repealed June 16, 2008). The explanatory note to the 2008 amendments, which yielded the present version of the relevant language in Pa.R.C.P.1042.1(a), plainly states that one of the purposes for this amendment was "to make clear that Rule 1042.1 *et seq*. . . . applies to claims by or on behalf of patients or clients against licensed professionals." Pa.R.C.P. 1042.6, comment. Pa.R.C.P.1042.1(a), as amended, was, thus, intended to explicitly narrow the type of professional liability claims in which a certificate of merit is required to only those in which there is a professional relationship between a licensed professional and a patient and client.

Next, in accordance with Rule 103, we find that the terms "patient" or "client," as used in Rule 1042.1, are to be given their common and approved meanings, inasmuch as they are not specially defined by other rules of civil procedure, nor have they otherwise acquired a peculiar meaning applicable in this context. [21] As our Court has

---

[21] Since we find no ambiguity in the meanings of these terms, there is no need to resort to extraneous policy considerations to define them, as such considerations become determinative only when the "words of a rule are not explicit." Pa.R.C.P. 127(c); cf. Touloumes (considering factors in aid of construction enumerated in Pa.R.C.P. 127(c) because language of rule was ambiguous). Regarding Rudick's argument that a plain meaning construction may lead to absurd results as applied to tort actions brought jointly against a licensed professional in contractual privity with the plaintiff and one who is not, this view is by no means universally shared. A noted authority on the operation of our rules of civil procedure, Judge Stanton R. Wettick, has offered thoughtful reasons why a certificate of merit should not be required in such circumstances:

> A third party who is allegedly injured as a result of a licensed professional's deviation from acceptable professional standards (i.e., a party who is not a patient or a client) does not have the same involvement with the licensed professional and does not have the same access to relevant information. Thus, third parties are likely to need significant discovery before they can obtain an expert opinion as to

(continued…)

noted many times in the past, the common and approved meaning of a word may be ascertained from an examination of its dictionary definition. See, e.g., Commonwealth v. Hart, 28 A.3d 898, 909 (Pa. 2011); Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 108 (Pa. 1999). Accordingly, the accepted definition of the term "patient," means "one under medical care." The Merriam-Webster Dictionary 528 (2004); see also Black's Law Dictionary 1163 (8th ed. 2009) (defining patient as "[a] person under medical or psychiatric care"). The leading relevant definition of the term "client" is "a person who engages the professional services of another." The Merriam-Webster Dictionary 134; see also Black's Law Dictionary 271 (defining client as "[a] person or entity that employs a professional for advice or help in that professional's line of work"). Rudick clearly did not provide medical care to the Brunos, so the Brunos were not patients of Rudick. Moreover, and critically, according to the allegations in their complaint, the Brunos did not engage, employ, or retain Rudick to provide engineering services to them; rather, Rudick was retained by *Erie* for the purpose of providing engineering services to Erie to evaluate damage to the Brunos' home caused by the mold. Consequently, as the Brunos did not engage, employ, or retain Rudick directly, they may not be considered clients of Rudick, and, therefore, they were not required under Rules 1042.1 and 1042.3 to file a certificate of merit. As a result, we reverse the

---

(…continued)
> whether the licensed professional deviated from an acceptable standard of care.

Penn Dev. v. Chevy Chase Const., 2010 Pa. Dist. & Cnty. Dec. Lexis 17 (Allegheny County Court of Common Pleas 2010).

order of the Superior Court affirming the order of the trial court dismissing the Brunos complaint against Rudick on this basis.[22]

### IV. Disposition.

The order of the Superior Court is reversed, and the matter is remanded to the Superior Court for further proceedings consistent with this Opinion. Jurisdiction relinquished.

Former Justice McCaffery did not participate in the decision of this case.

Mr. Chief Justice Castille and Messrs. Justice Saylor, Baer and Stevens join the opinion.

Mr. Justice Eakin files a concurring opinion in which Mr. Chief Justice Castille joins.

---

[22] While it is true that, in <u>Bilt-Rite</u>, we recognized *a cause of action* against a professional by a party not in privity of contract with the professional, we did not address the question of whether a certificate of merit would be required for a third-party plaintiff bringing such suits, since such question was not before our Court. Further, in the nearly ten years since the <u>Bilt-Rite</u> decision, we have not amended the rule to add such a requirement.