J-A03021-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LUAN KOTARJA AND RUSHDI KOTARJA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| NEGASH ABERRA, KELLER WILLIAMS PHILADELPHIA, CITY OF PHILADELPHIA | : | No. 1308 EDA 2022 |
| | : | |
| APPEAL OF: NEGASH ABERRA | : | |

Appeal from the Judgment Entered May 5, 2022
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 190903401

BEFORE:  KING, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SULLIVAN, J.:  **FILED SEPTEMBER 16, 2024**

Negash Aberra ("Aberra") appeals from the judgment entered in favor of Luan Kotarja and Rushdi Kotarja (collectively, "the Kotarjas").[1]  We affirm.

The trial court provided the relevant factual and procedural history, as follows:

> The present case stems from the sale of real property located at 2325 N. 22nd Street, Philadelphia, Pennsylvania . . .. The property building [("the property")] was an empty shell which [the Kotarjas], experienced real estate investors, sought to purchase, renovate, and flip.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The complaint named Keller Williams Philadelphia and the City of Philadelphia as additional defendants, but the matter was discontinued as to those defendants prior to trial.  **See** Praecipe to Settle, Discontinue, and End, 2/1/22.

[The Kotarjas] reached out to [a] Keller Williams agent, Luis Luciano [("Luciano")], to buy the property. They inquired and received confirmation that the property was under a current Make Safe Permit (hereinafter ["the permit" or the] "MSP"). The property was owned by [Aberra], an experienced real estate investor and contractor in his own right. As both parties were "sophisticated" contractors and the property was an empty shell, they agreed the sale would be "as is." [] Luciano, [Aberra's] longtime associate, was retained as the seller and buyer agent to mediate and effectuate the sale.

[The Kotarjas] signed the Agreement of Sale (hereinafter "AOS") on March 9, 2019[,] with the closing date [scheduled for] a month later. The AOS was for an "as is" sale of the property. However, before closing, [the Kotarjas observed] a new violation [notice] on the door on April 2, 2019[,] and immediately emailed . . . Luciano. [The Kotarjas] were alarmed because the [new] violation [notice] they had discovered was a Notice of Imminent Dangerous Condition, the most serious violation issued by the Department of Licenses and Inspections (hereinafter "L&I").

A Notice of Imminent Dangerous Condition warns property owners that their property is on the City of Philadelphia's "demo list" and can be demolished at any time[,] at the property owner's expense. Property owners have just five days to appeal the violation. In order to be removed from the demo list, an MSP must be attained from L&I. Once an MSP is granted, work must begin within ten days of issuance of the permit and must continue until the structure is deemed safe by L&I.

[The Kotarjas had] intended to rehabilitate the property[,] and demolition would set [them] back tens of thousands of dollars and weeks of work. This was a dealbreaker for [the Kotarjas,] and they emailed . . . Luciano as much. Placement of the property on the demo list was a material change in the status of the property, not unlike termites or water damage, which permits the recission of an agreement to buy property. In light of this new circumstance, [the Kotarjas] placed a contingency on the final sale of the property, [*i.e.,*] renewal of the MSP to make the property safe from the demolition. This contingency was communicated expressly to [] Luciano. [The Kotarjas] incurred a $2,000 surcharge to postpone the original closing date to give [Aberra] time to renew the permit.

- 2 -

[Aberra] was made aware of this contingency by [] Luciano. [Aberra] did not raise the "as is" AOS, dispute the contingency, or demand that [the Kotarjas] close on the sale despite the new "imminent danger" violation.

[Aberra] had already worked on the property under the MSP. All that was required of him to remove the property from the demo list was to renew said MSP. However, instead of renewing the permit, [Aberra] merely proceeded through the online process until he got to the bill [to renew the MSP] and printed out said bill.

[The Kotarjas], through . . . Luciano, received a receipt of payment of the $25 [application] fee to L&I, dated 4/9/19, and a copy of the old permit attached to an email which said the MSP was renewed and they were good to go with the sale. [Aberra] also produced a[n unpaid] bill[ing statement] for $114.50 titled "Approved Permit Billing Statement," stating that the application for a project at the property was approved. However, it is disputed whether this document was ever received by [the Kotarjas]. Email logs were produced showing [the Kotarjas] were sent the [application fee receipt] and old permit, but not of the "Approved Permit Billing Statement."

The email from . . . Luciano, forwarding documents[, *i.e.,* the receipt from the application fee and the old MSP,] and assurance of the all-clear from [Aberra], convinced [the Kotarjas] that the building was removed from the demo list and they moved forward with final closing.

The parties agreed to finalize closing on April 15, 2019. That morning, . . . Luciano went to L&I to check the status of the violation and found the property was still on the demo list. The parties [g]ave conflicting testimony, with themselves and each other, on what was said at closing. [Aberra] and [the Kotarjas] both began their testimony strenuously denying ever having talked to the other, even during closing. Pressed on the incredulity of being in the same room as a person signing a property sale contract and not saying a single word to each other, [Aberra] and [the Kotarjas] retracted their insistence on never having spoken. Further questioning revealed that not only had they spoken at closing, but they had exchanged cell phone numbers. [Aberra] allowed [the Kotarjas] to borrow the fence

around the property. While there is substantial dispute about what was said at closing, [it is undisputed that Aberra] never personally mentioned the failure to renew the MSP and remove the property from the demo list at closing. [Aberra] testified that his agent, Luciano, must have explained it. Nevertheless, closing finalized April 15 and [the Kotarjas] began renovations the same day.

On April 25, 2019, an L&I Inspector came by the property and informed the [Kotarjas] they were in violation without a current MSP. [The Kotarjas] immediately sent an employee to L&I to get a new permit, but they were denied and told an engineer letter was required. [The Kotarjas] went back to L&I on May 20, 2019 with engineer letter in hand[,] but were again denied for lack of plans and drawings. The building was demolished four days later.

[The Kotarjas filed suit against Aberra, asserting claims for breach of contract and fraudulent misrepresentation, arising from Aberra's failure to renew the MSP and his false representations that he had in fact renewed the MSP, both of which contributed to the Kotarjas being unable to renew the MSP prior to demolition of the property by the City of Philadelphia.]

[The Kotarjas] claimed the following damages:

- $124,180 — difference between rehabilitation of what was torn down and full rebuild

- $21,000 — cost of repairs completed by [the Kotarjas] prior to demolition

- $19,965 — demolition fee

- $35,000 — purchase price

Trial Court Opinion, 8/12/22, at 1-5 (footnotes, internal citations to the record, and unnecessary capitalization omitted).

The matter eventually proceeded to a non-jury trial, after which, the trial court found Aberra liable for breach of contract and fraudulent

misrepresentation. *See id*. at 9-18.[2] The trial court concluded that while the written AOS did not require a renewed MSP, the parties created a contingency to the contract that required renewal of the MSP in order for the sale to be finalized, and Aberra did not "fulfill his contractual obligation." *Id*. at 10-11. Additionally, the trial court found that Aberra "consciously" made the "decision to mislead [the Kotarjas] as to the status of the renewal[, which] resulted in actual demolition of the property," thereby making him liable for fraudulent misrepresentation. *Id*. at 12-13.[3]

---

[2] Pennsylvania Rule of Civil Procedure 1020(a) provides that where a plaintiff states more than one cause of action, "[e]ach cause of action and any special damage related thereto shall be stated in a separate count containing a demand for relief." Pa.R.Civ.P. 1020(a). We note that the Kotarjas pleaded both breach of contract and negligent and/or fraudulent misrepresentation in a single count against Aberra in the complaint. *See* Complaint, 9/26/19 (unnumbered at 4-5). Despite apprehending that the Kotarjas had stated claims for breach of contract and for negligent and/or fraudulent misrepresentation—and despite asserting a gist of the action argument, *see* N.T., 2/1/22, at 22—Aberra did not file preliminary objections to this defect in the complaint, and, thus, has waived any claim based on Rule 1020(a). *See*, *e.g.*, *Rellick-Smith v. Rellick*, 147 A.3d 897, 900 n.8 (Pa. Super. 2016).

[3] The trial court entered an order in which it entered a verdict for the Kotarjas; however, the trial court did not indicate the cause(s) of action for which it found Aberra liable. *See* Order, 2/15/22. However, in its Rule 1925(a) opinion, the trial court indicated it had found Aberra liable for negligent and/or fraudulent misrepresentation, set forth the elements for each tort, and analyzed the elements of fraudulent misrepresentation together (rather than *seriatim*). *See* Trial Court Opinion, 8/12/22, at 1, 4, 11-18. Notwithstanding the court's imprecisions—or the fact that the court set forth the elements for both torts—the court ultimately analyzed the six elements of fraudulent misrepresentation, but not all of the elements for negligent misrepresentation. *Compare id*. at 11-18 *with*, *e.g.*, *Richards v. Ameriprise Financial, Inc.*, 152 A.3d 1027, 1038 (Pa. Super. 2016) (stating that "The elements of
*(Footnote Continued Next Page)*

The trial court awarded the Kotarjas $41,079.50, representing compensation for: the work done on the property by the Kotarjas prior to demolition ($21,000.00); the demolition bill ($19,965.00); and the unpaid permit bill ($114.50). *See id*. at 5. Aberra filed a post-trial motion, which the trial court denied. *See* Post-Trial Motion, 2/25/22; *see also* Order, 4/12/22.[4] Aberra timely appealed. *See* Notice of Appeal, 5/11/22. Both Aberra and the trial court complied with Pa.R.A.P. 1925.

Aberra raises the following issues for our review:

1. [Whether the Kotarjas'] claims based on the [AOS] are released[?]

2. [Whether] the [trial c]ourt erred in finding [Aberra] liable in misrepresentation[?]

3. [Whether the c]ourt erred in not applying the gist of the action doctrine[?]

_____

negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact **and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words**") (internal citation and quotations omitted; emphasis added). That is, the trial court did not expressly conclude that Aberra failed to make a reasonable investigation of the truth of his representation, but instead found that Aberra misrepresented the status of the property "**knowing that it was not**" off the demolition list. **See** Trial Court Opinion, 8/12/22, at 14-15. Thus, the trial court's analysis reveals that it had rendered a verdict for the Kotarjas based on fraudulent, rather than negligent, misrepresentation. Accordingly, we limit our analysis to this cause of action.

[4] The order is dated April 11, 2022, but docketed April 12, 2022. The trial court entered judgment in favor of the Kotarjas on May 5, 2022.

> 4. [Whether the Kotarjas'] damage claims are based on illegal activity[?]

Aberra's Brief at unnumbered 11, 15, 18, 24 (issues re-ordered for clarity).[5]

We begin with our standard of review for non-jury trials:

> [We must] determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue . . . concerns a question of law, our scope of review is plenary.

*Richards v. Ameriprise Fin., Inc.*, 217 A.3d 854, 862 (Pa. Super. 2019) (internal citation and indentation omitted); *see also Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. 2003) (providing that "we [may] reverse the trial court only if its findings of fact are predicated on an error of law or are unsupported by competent evidence in the record") (internal citation and quotations omitted).

In his first issue, Aberra argues the trial court erred in finding that the parties modified the AOS so as to require him to provide a renewed MSP prior

_____

[5] We note with disapproval that Aberra presents seven issues in the Statement of Questions Involved section of his brief, but he divides his argument into four sections as stated above. **Compare** Aberra's Brief at unnumbered 3-4 **with id**. at 11, 15, 18, 14; **cf**. Pa.R.A.P. 2119(a) (stating that "[t]he argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent"). We address Aberra's issues as formulated in the argument section of his brief.

to closing. **See** Aberra's Brief at unnumbered 12. This Court has previously explained:

> Three elements are necessary to plead properly a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages. Additionally, it is axiomatic that a contract may be manifest orally, in writing, or as an inference from the acts and conduct of the parties.

***Burlington Coat Factory of Pennsylvania, LLC v. Grace Const. Mgmt. Co., LLC***, 126 A.3d 1010, 1018 (Pa. Super. 2015) (internal citation, indentation, and brackets omitted). This Court has also provided:

> A written contract which is not for the sale of goods may be modified orally, even when the written contract provides that modifications may only be made in writing. An agreement that prohibits non-written modification may be modified by subsequent oral agreement if the parties' conduct clearly shows the intent to waive the requirement that the amendments be made in writing. An oral contract modifying a prior written contract, however, must be proved by clear, precise and convincing evidence.

***Somerset Cmty. Hosp. v. Allan B. Mitchell & Associates, Inc.***, 685 A.2d 141, 146 (Pa. Super. 1996) (internal citations omitted).

Aberra argues that any conversations that occurred between himself and the Kotarjas are barred from being part of their contract (*i.e.*, the AOS) by virtue of the integration clause in paragraph 25 of the AOS, which expressly disclaims any representations by Aberra not contained within the AOS. **See** Aberra's Brief at unnumbered 12. Aberra also cites paragraph 28 of the AOS which releases him from liability for any and all claims. **See id**. Aberra

maintains that, because the written AOS did not require a renewed MSP, he could not breach the contract by failing to provide the renewed MSP.

The trial court considered Aberra's assertions and determined they lack merit:

> The original suit brought by [the Kotarjas] concerned the fact that they bought the property only after getting explicit assurance from [Aberra], and their dual agent [] Luciano, that it was safe from demolition, only for the city to demolish it two weeks later. The [c]ourt found this to be an accurate interpretation of the facts. [Aberra] contends that [the Kotarjas] agreed to purchase the property "as is," meaning [the Kotarjas] waived all warranties and assumed risk of defect. There is no dispute that the parties agreed to an "as is" sale and [the Kotarjas] received clean title.
>
> The original AOS was for an "as is" sale of the property. However, a material change in the status of the property — its placement on the "demo list" — occurred in the interim between the AOS and the closing date. As [] Luciano himself admits, placement on the demo list is a material change which permits parties to add contingencies or rescind sale agreements — including "as is" agreements. [Aberra] and Luciano knew that [the Kotarjas] would not close if the property remained on the demolition list. . . . [Aberra] did not contest the contingency, reference the "as is" AOS, demand that [the Kotarjas] close on the sale despite the new "imminent danger" violation, or communicate any lack of desire or ability to renew the MSP.
>
> At trial, all of the parties gave conflicting testimony about the details relating to the sale of the property . . . once notice was given that the property was on the city's demo list. The credibility of [Aberra] and Luciano was particularly strained given these contradictory accounts of what occurred regarding efforts to address the demolition listing, the purported remedy, communication with [the Kotarjas] to address the issue, and what occurred at closing. What is clear according to all accounts is that [the Kotarjas] would not close on the property unless it was taken off the demolition list and a valid [MSP] was in place.
>
> It is clear that the parties agreed and requested that the sale would not be finalized until the material change was

- 9 -

remediated by renewal of the MSP. This created a new contractual [requirement, which Aberra] agreed to satisfy . . .. [Aberra] knew that the sale would not be finalized unless the [requirement] was satisfied. . . ..

Rather than fulfill his contractual obligation, [Aberra] made a negligent or fraudulent misrepresentation with the specific intention of convincing [the Kotarjas] that the [MSP was renewed] so the sale could be finalized. [Aberra] was determined that the sale proceed[, given] his purposeful ambiguity surrounding the demolition list[,] as evidenced by his testimony [at trial that], "My main purpose is this settlement, to leave and I get paid. To sign, pay, and leave."

Trial Court Opinion, 8/12/22, at 9-11 (footnote, some quotations, internal citations to the record and unnecessary capitalization omitted).

Following our review of the evidence in the light most favorable to the Kotarjas as the verdict winners, we discern no error in the trial court's conclusion that there was clear, precise, and convincing evidence that the parties modified the contract such that it required Aberra to procure a renewed MSP. Rushdi Kotarja testified that he would not have closed on the contract without a renewed MSP. *See* N.T., 2/1/22, at 33. He emailed their joint real estate agent, Luciano, twice to confirm Aberra had renewed the MSP prior to closing. *See id*. at 29-30. Luciano testified that he knew the Kotarjas would not close on the property unless there was a renewed MSP. *See id*. at 92, 95. Luciano agreed that the Kotarjas would "have the right to say, '[N]o, I'm not going to close unless this gets corrected . . ..'" *Id*. at 108. Aberra also indicated he knew the Kotarjas were expecting a valid MSP with the property, which is why he sent them the receipt for an application for a renewed MSP along with the prior expired MSP. *See id*. at 128. Because the evidence of

the parties' conduct shows they intended to orally modify the contract to require a valid MSP, yet Aberra failed to provide one, Aberra's issue warrants no relief. *See Somerset Cmty. Hosp.*, 685 A.2d at 146.

In his second issue, Aberra maintains that the trial court erred in finding him liable for fraudulent misrepresentation. This Court has set forth the relevant law as follows:

> In order to prove fraud[,] the following elements must be shown: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.
>
> * * * *
>
> [I]n real estate transactions, fraud arises when a seller knowingly makes a misrepresentation, undertakes a concealment calculated to deceive, or commits non-privileged failure to disclose. Fraud is a generic term used to describe anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.

*Milliken v. Jacono*, 60 A.3d 133, 140 (Pa. Super. 2012) (en banc) (internal citations and indentation omitted). Under "common law fraud[,] a seller of real estate is only liable for failing to reveal objective material defects." *Id*. at 141.

Aberra argues the trial court erred in finding him liable for fraudulent misrepresentation for the following reasons: he provided the Kotarjas a billing receipt generated by the City of Philadelphia that had undergone no

alterations. *See* Aberra's Brief at unnumbered 20. He never "represented the permit [application] receipt as a make safe permit," nor did he tell the Kotarjas they could proceed with work on the property, nor did he indicate he paid the bill. *See id*. at 21. Aberra also argues he had no intent to mislead, as he, through his agent Luciano, made clear to the Kotarjas that the receipt was not an MSP and was "merely" an application receipt. *See id*. at 22. He also maintains the Kotarjas were "knowledgeable, sophisticated contractors," and, therefore, any reliance on his statements was unjustified. *See id*. at 23.

The trial court considered this issue and rejected it:

> As previously discussed, [Aberra] knew that he had to remediate the violation on the property to finalize its sale. This remediation required [him] to renew the MSP he had previously secured. Renewal of the MSP would provide [the Kotarjas] the entire term of the MSP (months) to be granted their own MSP, as opposed to the days between the Notice of Imminent Danger and possible demolition. Renewal of an already existing MSP is a simple process which simply required [Aberra] pay a $114.50 fee to L&I. A new MSP entails a lengthy application process, including the securing of an engineer letter, an engineer report, architectural drawings, and safety reports. Had [Aberra] simply paid the $114.50 fee to L&I[,] the existing MSP could have been renewed giving the [Kotarjas] time to get the permit in their name, as they intended, and submit the required documentation to the city. Most importantly, the property would have been taken off the city's demolition list.
>
> Significantly, [Aberra] consciously did not pay the $114.50 fee which was required to remove the demolition threat, stating[,] "Never paid. I don't have to pay."
>
> * * * *
>
> Unfortunately, here, [Aberra's] failure to pay the $114.50 fee and [his] decision to mislead [the Kotarjas] as to the status of the renewal resulted in actual demolition of the property.

- 12 -

As soon as the new notice of violation appeared, [the Kotarjas] notified dual agent Luciano that settlement was in jeopardy unless the risk of demolition was removed. Luciano conveyed this contingency to [Aberra], who was thus made aware that a renewed [MSP] was required to save the sale. Luciano and [the Kotarjas] communicated through a series of e-mails, concluding with one from Luciano that[,] "Yes. [Aberra] just needs to renew the make safe permit. I will mail you the picture of it. We are still good to close. Thanks."

What was sent by Luciano was a twenty-five-dollar receipt, provided by [Aberra], for an application fee from [L&I], along with an old building permit. There is dispute as to when or if there was subsequent communication from Luciano providing [the Kotarjas] documentation pertaining to the billing statement for $114.50, the payment of which would have stopped demolition.

[Aberra] and Luciano gave conflicting testimony about what occurred at closing. According to Luciano, "[Aberra] has said to me and the clients at the settlement table many times that he was not going to pay for the building permit for someone else to perform any work under his permit."

* * * *

[The court credited the following testimony,]

1. After the signing of the "as is" agreement of sale, a new violation with impending demolition was posted, a contingency which all admit was a deal breaker.

2. Closing on the property would not occur unless a renewed permit taking the property off the demolition list was produced.

3. [Aberra,] through his agent[,] provided a receipt for $25 (an application fee to L&I) along with an old permit, purporting to be proof of permit renewal. [The Kotarjas] proceeded to closing because of that representation.

4. [Aberra] received a billing statement for $114.50 from the city, the payment of which was required to set the permit renewal process in motion and stop demolition. [Aberra] refused to pay that fee, as he had done in similar situations.

- 13 -

5. Closing took place because of the fraudulent and/or negligent misrepresentations that there was a valid permit.

6. The property was demolished shortly after closing.

***Credibility lies in favor of [the Kotarjas] regarding the $114.50 billing statement***. Circumstantially, based on the evidence, if [the Kotarjas] had been made aware that the payment of $114.50 was required to stop demolition, they would have refused to close, or paid the fee. [Aberra] and his agent, with whom he had previous business dealings, gave scattered testimony about how and when [the Kotarjas] were purportedly provided the unpaid billing statement. Under the guise of leading [the Kotarjas] to believe that the property was off the demolition list, knowing that it was not, [Aberra] made sure closing took place and he got paid.

* * * *

Even if operating under the assumption that the parties did not speak to one another[,] this defense fails. [The Kotarjas] made it clear, and [Aberra] concedes, that the [requirement] to finalize the sale was a valid MSP. Knowing this, [Aberra] sent documents which could only reasonably be understood as satisfying [the Kotarjas'] express [requirement]. They were "good to go."

The defense that [] Luciano conveying the documents he was sent by [Aberra] absolves [him, Aberra,] of liability is also without merit. [] Luciano forwarding [Aberra's] message rather than [Aberra] sending it directly does not clean [Aberra's] hands.

* * * *

It is unclear what [Aberra] is trying to say with regard to the documents being unaltered. Fraudulent misrepresentation does not require forgery, just misrepresentation. The manner in which the documents were presented and the communication that the parties were good to go was a plain misrepresentation of the status of the permit, the very crux of the issue.

* * * *

This also speaks to [Aberra's] argument that he cannot be held liable for the conveyance of an unaltered city receipt. [Aberra] was told by [] Luciano of the [Kotarjas' requirement that a renewed MSP be provided]. In response, [Aberra] sent the receipt with the express purpose of satisfying the [requirement]. The fact that it is a genuine government document is precisely why it was deceiving and justifiable for [the Kotarjas] to rely on [it].

Trial Court Opinion, 8/12/22, at 12-18 (internal citations to the record and unnecessary capitalization omitted, emphasis added).

The evidence, in the light most favorable to the Kotarjas as the verdict winners, is competent to support the trial court's findings that Aberra committed fraudulent misrepresentation. The evidence shows Aberra made a representation, *i.e.*, that the MSP had been renewed: the Kotarjas made clear to Luciano that they required a new MSP to close; Luciano conveyed this to Aberra; and Aberra, in response, sent to the Kotarjas via Luciano a receipt for a new application and the old MSP. **See** N.T., 2/1/22, at 30-31. The representation was material, because, as Aberra conceded, he knew the Kotarjas would not close without the MSP. **See id**. at 128. Aberra knowingly made the false representation: Aberra knew he had not paid the $114.50 needed to get the MSP to remove the property from the demolition list. **See id**. at 129-31. Aberra made this misrepresentation intentionally so that the Kotarjas would rely on it and close on the sale. **See id**. at 128. The Kotarjas justifiably relied on it, since, upon asking for proof that the MSP had been renewed, Aberra and Luciano sent them a receipt for the application and an old permit, which caused them to believe the MSP was renewed. **See id**. at

31. The Kotarjas' injury—*i.e.*, the demolition of the building following their repairs to it—was proximately caused by Aberra's misrepresentation that a new MSP had been obtained and that the property was not subject to demolition. ***See id***. at 34, 36, 38, 43, 45-46, 50-51 (Rushdi Kotarja testifying that: following Aberra's misrepresentation about the renewed MSP, closing occurred on April 15, 2019; the Kotarjas performed repairs to the property in reliance on this misrepresentation; a city inspector informed the Kotarjas ten days later, on April 25, 2019, that there was no valid MSP and that repairs needed to be halted; that there was no time to get new engineering plans to acquire a new permit prior to the building being demolished on May 24, 2019); ***see also Milliken***, 60 A.3d at 140 (stating that fraudulent misrepresentation requires (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance). Thus, Aberra's assertion that the trial court erred in finding him liable for fraudulent misrepresentation, warrants no relief.

Aberra next argues that the trial court erred by not applying the gist of the action doctrine. **See** Aberra's Brief at unnumbered 24.[6] Generally, the gist of the action doctrine is "designed to maintain the conceptual distinction between breach of contract claims and tort claims . . .[and] precludes plaintiffs from re-casting ordinary breach of contract claims into a tort claim." **Mirizio v. Joseph**, 4 A.3d 1073, 1079 (Pa. Super. 2010). As our Supreme Court held, following its thorough analysis, in **Bruno v. Erie Ins. Co.**, the "nature of the duty alleged" is the "critical determinative factor in determining whether the claim is truly one in tort or for breach of contract." 106 A.3d 48, 111-12 (Pa. 2014). Contractual duty is based in terms created between the contracting parties and involves "a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract." **Id**. at 112. A duty based in tort, however, involves an individual's broader social responsibility to others and exists regardless of the contract between

---

[6] We note that Aberra did not expressly raise the gist of the action doctrine in any pre-trial pleadings. However, Aberra raised the issue at the conclusion of the trial, in a post-trial motion, and now on appeal. **See** N.T., 2/1/22, at 150 (Aberra arguing for application of the gist of the action doctrine); **see also** Post-trial Motion, 2/25/22, at ¶ 13 (asserting error following the trial court's decision not to apply the gist of the action doctrine). As neither the trial court nor the Kotarjas argue Aberra was required to raise gist of the action in a pre-trial pleading, we decline to consider the issue of waiver. **Cf. Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.**, 71 A.3d 923, 931 (Pa. Super. 2013) (finding waiver of a gist of the action argument where the appellant failed to raise the issue "at **trial** or in **post-trial motions**") (emphasis added); **Knight v. Springfield Hyundai**, 81 A.3d 940, 944 (Pa. Super. 2013) (appellee raising the gist of the action doctrine in preliminary objections).

the parties. *See id*. The factual allegations averred are of "paramount importance" in the analysis and determination; and, crucially, "the mere existence of a contract between two parties does not, *ipso facto*, classify a claim . . . for injury or loss suffered as the result of actions by the other party in performing the contract as one for breach of contract." *Id*. at 112-114. A claim is predicated in tort where the contract "is regarded merely as the vehicle, or mechanism, which established the relationship between the parties." *Id*. at 114. Further:

> In real estate transactions, fraud arises when a seller knowingly makes a misrepresentation, undertakes a concealment calculated to deceive, or commits non-privileged failure to disclose. Fraud is a generic term used to describe anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.

*Youndt v. First Nat'l Bank of Port Allegany*, 868 A.2d 539, 545 (Pa. Super. 2005).

Aberra argues that under this real property AOS, any applicable provisions regarding the renewal of the MSP and/or the demolition of the property were contained in the AOS; thus, the only duty owed was contractual in nature. *See* Aberra's Brief at unnumbered 26. Specifically, Aberra brazenly states that paragraphs 18 (risk of loss provision) and 28 (release of liability) of the AOS control, and insofar as the seller "maintained the property against risk of loss before closing," he was absolved of his contractual responsibility because the demolition occurred after he transferred an "intact building" to

the Kotarjas. *Id*. While Aberra additionally asserts that the Kotarjas brought only a single breach of contract claim, he concedes the Kotarjas' claim "sound[s] in tort." *See id*. at 25.[7]

The trial court considered Aberra's arguments and concluded they merit no relief:

> [Aberra] seeks to have this [c]ourt shield him from the consequences of his deception by intoning the "gist of the action" doctrine. The "gist" of this action is not the sale of the [p]roperty, but [his] misrepresentation of a permit.
>
> * * * *
>
> In the present case, [Aberra] breached his duty of honesty by misrepresenting renewal of the MSP and that the building was removed from the demo list. This breach was collateral to the contract. [Aberra] made it abundantly clear in his testimony to th[e c]ourt that he would not renew the permit and that it was not his responsibility to do so as the AOS was for an "as is" sale. [Aberra] was able to simply and succinctly convey this to the [c]ourt. However, rather than send same to [the Kotarjas], [Aberra] sent the all-clear with official city documents attached. [Aberra's] misrepresentations were collateral to the contract with the explicit intention of inducing [the Kotarjas] to close.
>
> [Aberra] wanted to get paid as quickly as possible and dump the problem on [the Kotarjas]. The only thing standing in his way was that [the Kotarjas] would never accept the property without a valid MSP. In [Aberra's] own words, "My main purpose is . . . to leave and I get paid. To sign, pay, and leave."

Trial Court Opinion, 8/12/22, at 19, 21 (citation to the record omitted).

---

[7] In addition to failing to cite to the record in this portion of his brief, *cf*. Pa.R.A.P. 2119(c), Aberra fails to mention the subsequent negotiations after the AOS was signed but before closing of the property, or the discussions on the closing date.

Following our review, we discern no error of law by the trial court. As we noted ***supra***, between the AOS signing and closing, the parties modified the contract through emails and conversations due to a "Notice of Imminent Dangerous Condition" that resulted in placing the property on a demolition list. ***See supra*** at 10-11; ***see also*** Trial Court Opinion, 8/12/22, at 9-10. The contingency to, and modification of, the AOS required a renewal of the MSP that would, in effect, remove the property from the demolition list. ***See*** Trial Court Opinion, 8/12/22, at 10. As the trial court noted, Aberra's actions thereafter, that is, his misrepresenting the status of the MSP and that the building was removed from the demo list, "breached his duty of honesty . . . [and] this breach was collateral to the contract." ***Id***. at 21 (relying on ***Earl v. NVR, Inc.,*** 990 F.3d 310, 314-316 (3d Cir. 2021) (applying ***Bruno***)). We agree.

As stated above, the tort of fraudulent misrepresentation requires a knowingly false representation, material to the transaction, made with the intent to mislead another into justifiably relying on the misrepresentation, and resulting injury/damages. ***See Milliken***, 60 A.3d at 140. Fraud "arises when a seller knowingly makes a misrepresentation [or] undertakes a concealment calculated to deceive . . .." ***Youndt***, 868 A.2d at 545. Our task, per ***Bruno***, is to determine whether Aberra's misrepresentations violated a specific promise to do something he would not ordinarily have been obligated to do but for the existence of the contract (denoting contractual duty) or

involved a broader social responsibility to others that exists regardless of the contract between the parties (denoting a duty in tort). Thus, we closely review the facts relied upon by the trial court to determine whether the contract at issue was merely a vehicle establishing the relationship between the parties during which the tort was committed. ***See Bruno***, 106 A.3d at 112, 114.

In its gist of the action analysis, the trial court first reviewed the facts presented at trial, including: 1) After the signing of the "as is" AOS, a new violation with impending demolition was posted, which constituted a contingency, which all agreed was a deal breaker. ***See*** N.T., 2/1/22 at 29-30, 128. 2) Closing would not occur unless Aberra renewed the MSP permit, which would take the property off the demolition list. ***See id***. at 35-36, 95, 107-108, 128. 3) Aberra, through the dual agent (Luciano), provided a receipt for the L&I application fee with a copy of the old permit to Kotarja, and in an email represented that the documents were proof of the permit renewal and noting the parties were good to close on the sale. ***See id***. at 30-31; ***see also*** Pls.' Trial Exhibit 2. 4) The Kotarjas proceeded to closing on April 15, 2019 based on these misrepresentations. ***See*** N.T., 2/1/22, at 36.

The trial court credited Aberra's testimony which clearly showed a misrepresentation to the Kotarjas regarding renewal of the MSP prior to the closing. Aberra agreed the document that would remove the property from the demolition list was entitled "Approved Permit Billing Statement," for which Aberra testified he applied, but never paid. N.T., 2/1/22, 130-31. Aberra

further testified that he never directly told Kotarja about this document at any time. *See id*. at 130. The trial court also credited Luciano's testimony that on the day of the closing, he went to L&I to confirm that the property was removed from the demolition list, but, to the contrary, found that the property remained on the demolition list because the invoice was not paid. *See id*. at 88-89. Luciano confronted Aberra before closing and Aberra admitted he had not paid it. *See id*. at 88. Aberra never personally mentioned the failure to renew the MSP and remove the property from the demolition list at closing. *See id*. at 32, 45, 61, 136-37. And although there was conflicting testimony regarding whether the "Approved Permit Billing Statement" was sent to Kotarja prior to closing, and whether it was discussed at the closing, the trial court made a credibility determination in favor of the Kotarjas, concluding that "the credibility of [Aberra] and Luciano was particularly strained given these contradictory accounts of what occurred regarding efforts to address the demolition listing, the purported remedy, communication with buyer to address the issue, and what occurred at closing." Trial Court Opinion, 8/12/22, at 10. The trial court also concluded Rushdi Kotarja's testimony was credible on this specific issue, namely, that if he had been made aware of the payment required to stop demolition, he would have either refused to close,

or paid the $114.50 fee; whereas Aberra and Luciano gave inconsistent testimony about the invoice. *See id*. at 14.[8]

It is clear from the facts of record that Aberra breached two separate duties, one imposed by the contract, and one imposed by a broader social responsibility. The unforeseen change in the status of the property led to a contingency between the parties requiring Aberra to renew the MSP so that it would be removed from the demolition list before closing, or Kotarja would not purchase the property. This was clearly a specific promise to act that Aberra would not have otherwise been required to do but for the existence of the modified contract; therefore, it was a contractual duty. However, his false misrepresentations that he renewed the MSP and the property was no longer on the demolition list, both directly and through his agent, induced the Kotarjas to proceed with the closing. These misrepresentations acted as a separate inducement to bring the Kotarjas to the table under false pretenses, and caused them damages including the cost of work performed on the subsequently-demolished building and the demolition fee, which, but for the misrepresentations, the Kotarjas would not have suffered; and it is these knowingly false representations that clearly breached Aberra's broader social responsibility of honesty and fair dealing that exist regardless of the contract.

_____

[8] It is not "the role of an appellate court to pass on the credibility of witnesses; hence[,] we will not substitute our judgment for that of the factfinder." *Lebanon County Housing Authority v. Landeck*, 967 A.2d 1009, 1012 (Pa. Super. 2009) (internal citation omitted).

For these reasons, the false statements made by Aberra to induce Kotarja are the gist of the action, and the contract is collateral.

Where misrepresentations induce a party to enter into a contract, this Court has held that the gist of the action is in tort, and the contract is collateral. *See Mirizio*, 4 A.3d at 1087; *Knight*, 81 A.3d at 951; *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 719 (Pa. Super. 2005). As the trial court found in the instant matter, everyone involved in the contract knew "closing on the property would not occur unless a renewed permit taking the property off the demolition list was produced." Trial Court Opinion, 8/12/22, at 14. Luciano, Aberra's agent, sent an email with a confirmation of license fee and the old MSP, and assured the Kotarjas that they "are still good to close." *Id*. at 4, 13. Furthermore, on the day of settlement/closing, Luciano actually went to L&I to confirm the status and found that the property was still on the demolition list. *See id*. at 4. The trial court noted the conflicting testimony on what information was exchanged at the closing, but made a credibility determination that the actions of Aberra and Luciano were consistent with leading Rushdi Kotarja to believe the property was off the demolition list, even though both Aberra and Luciano knew on the date of settlement that it was not. *See id*. at 14. Further, the trial court found Rushdi Kotarja's testimony more credible because all parties agreed that taking the property off the demolition list by renewing the MSP was required in order for the closing to occur, and Kotarja testified if he would have known it was not

(as Aberra and Luciano knew) he would have either refused to close, or paid the fee. *See id*. at 14. This Court cannot overrule these commonsense credibility determinations.

Given the facts of record and the trial court's credibility determinations, it is clear that: 1) Aberra and Luciano knew on the day of closing that the property was still on the demolition list because the MSP had not been renewed; 2) that if that fact was known by Rushdi Kotarja, he would not have closed; and 3) but for Aberra's and Luciano's knowingly false misrepresentations and failures to clarify what they knew at the closing/settlement, the Kotarjas were induced into purchasing the property. These statements, emails, documents, etc. are proof of the false misrepresentations Aberra made to induce the Kotarjas to close on the contract, and hence support the trial court's determination that the gist of the action is in tort (fraudulent misrepresentation), and the contract is collateral. Accordingly, the trial court committed no errors of law, and Aberra's argument merits no relief.[9]

---

[9] Aberra cites *Patel v. Kandola Real Estate, LP*, 271 A.3d 421, 431 (Pa. 2021), in which this Court affirmed the trial court's grant of summary judgment in favor of two co-defendants, and concluded that claims for tortious interference and conversion stemmed from contractual obligations and were therefore barred by the gist of the action doctrine. *See* Aberra's Brief at unnumbered 25-26. We find *Patel* distinguishable. It is the "nature of the duty alleged to have been breached" which is the "critical determinative factor in [ascertaining] whether the claim is truly one in tort, or for breach of contract." *Bruno*, 106 A.3d at 68. Here, in contrast to *Patel*, Aberra
*(Footnote Continued Next Page)*

In his fourth and final argument, Aberra asserts that the court erred in holding him liable for the cost of repairs the Kotarjas had made to the property as well as for the demolition fees assessed by the City of Philadelphia. **See** Aberra's Brief at unnumbered 15-17. For damage awards, our review is as follows:

> Our standard of review of a trial court's award of damages is narrow: In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence. If the verdict bears a reasonable resemblance to the damages proven, we will not upset it merely because we might have awarded different damages.

**Witherspoon v. McDowell-Wright**, 241 A.3d 1182, 1187 (Pa. Super. 2020) (internal citation omitted). Additionally, "[t]he duty of assessing damages is within the province of the [fact-finder,] and, thus, as a general matter, a compensatory damage award should not be interfered with by the court unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence." **Paves v. Corson**, 801 A.2d 546, 548–49 (Pa. 2002).

The core of Aberra's argument is that the Kotarjas performed repairs to the property without an MSP, and so the Kotarjas "assumed the risk that

---

breached two duties, one imposed by the contract, and one imposed by broader social policy, that is, Aberra was contractually obligated to renew the MSP; however, the Kotarjas' fraudulent misrepresentation claim stems from Aberra's violation of his broader social duty not to commit fraud by knowingly passing off misleading documents about the status of the MSP.

performing any work without a legal permit would subject their property to demolition or other sanctions by the [c]ity." Aberra's Brief at unnumbered 16. Aberra also maintains the Kotarjas' demolition costs were "between [them] and the City of Philadelphia and did not involve . . . Aberra." *See id*. at unnumbered 16.

The trial court considered and rejected this claim:

> [Aberra] . . . contends that the trial court erred as a matter of law and abused its discretion in awarding damage claims for work which was not approved by L&I. The [c]ourt struggles to ascertain the relevance of this point. [Aberra] is himself the very reason why work was done without L&I approval. Further, as elaborated above, the [c]ourt is well within its power to award the actual damages suffered as a direct consequence of the fraud perpetrated by [Aberra]. The [c]ourt used its discretion to award a fraction of the damages which were reasonably claimed by [the Kotarjas].

Trial Court Opinion, 8/12/22, at 23-24.

Based on our review, we conclude the trial court's award of damages bears a reasonable relation to the damages proven. Rushdi Kotarja testified that the work performed on the building following closing cost $21,000. *See* N.T., 2/1/22, at 38. The City of Philadelphia billed him $19,965 for the demolition. *See id*. The cost to renew the MSP was $114.50. *See*, *e.g.*, *id*. at 131. Rushdi Kotarja explained that he began repairs to the building right after closing. *See id*. at 33 (Kotarja explaining that he started repairs from the day he "obtained the building"); *see also id*. at 36 (Kotarja explaining that, "[a]s soon as we purchased the property, we start[ed] the repairs"). The work was begun because of Rushdi Kotarja's "understanding [that the MSP]

was already renewed **for me**." **Id**. at 43 (emphasis added). By the time Rushdi Kotarja learned he had no MSP, there was not enough time to obtain a new one prior to the building's demolition. **See id**. at 45-46. Thus, the evidence shows that the Kotarjas expended $21,000 for repairs on the building, and were too late to renew the MSP and avoid demolition and the consequent $19,965 demolition fee, based on their mistaken belief that Aberra had renewed the permit for them. Aberra argues he cannot be liable for the work that the Kotarjas paid for because the work was not authorized by the city; however, the Kotarjas began repairs believing such repairs were authorized by the city because of Aberra's false representations. The Kotarjas, again, because of Aberra's misrepresentations about the MSP, were too late to avoid the demolition and fees associated with it. Accordingly, Aberra is due no relief.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/16/2024